Cornet v. Cornet.

---

GEORGE A. CORNET et al., Appellants, v. HENRY L. CORNET et al.

GEORGE A. CORNET et al. v. HENRY L. CORNET et al., Appellants.

### Division One, December 20, 1916.

1.  **COSTS OF LITIGATION:** Trusteeship: Accounting: Construction of Will: Fraud. Although a suit in which the petition charges the defendant, named in a will as trustee for his improvident brother, had violated his trust, had wrongfully appropriated the brother's property to himself, had been guilty of actual fraud, and praying that he be removed and compelled to render an accounting, which allegations are strenuously denied and resisted throughout by said trustee, incidentally involves a construction of the will, it is not essentially a suit to construe a will; and having been found guilty of fraud and removed, the trustee in the subsequent accounting is not entitled to have the costs he incurred and the attorney's fees which he paid in making the fight against his removal for misconduct, charged against the trust fund, but the costs should be charged against him.

2.  **COSTS OF TRUSTEESHIP:** Incurred in Violation of Trust. The expense incurred by the trustee in administering the fund in violation of the trust cannot be taxed against the trust fund. Where the trustee by fraud obtained from the unfortunate beneficiary a deed to the trust property, which he afterwards administered without compensation, he cannot, when removed and compelled to account, reach back and be compensated for such administration.

3. ——: ——: Commissions for Sale of Real Estate.  In an accounting by the trustee removed for misconduct, he is not entitled to commissions on the price of real estate which he sold in violation of the trust instrument, although the price obtained is accepted as and for the land.

4. INVESTMENT OF TRUST FUNDS: Prudence Required: Outside of Court's Jurisdiction.  A direction in a will to the trustee "to manage such trust fund, and to make the same productive in such manner as he may deem most safe and advantageous" did not authorize the trustee to disregard the rules prescribed by equity for the investment of trust funds, one of which is that the safety of the fund is a primary element.  Safety does not mean simply that in the honest course of events the security will be paid.  It means that its payment may be enforced through the operation of the governmental power to which the trustee has rightful access, and without recourse to the laws and governmental machinery of foreign nations.

5. ——: In Mexican Bonds.  An investment in 1906 of the trust fund in the bonds of the State of Jalisco, Mexico, with no other specific direction in the trust instrument to the trustee than "to manage such trust fund, and to make the same productive in such manner as he may deem most safe and advantageous," was not in keeping with the rules which equity prescribes for the investment of trust funds, if done without consulting the beneficiary, although the trustee was perfectly honest in his faith in the then Mexican regime, and although bankers and trust companies in the community invested their own funds in the same series of bonds; and the trustee, when compelled to account, must take the bonds, and respond for the amount of cash invested in them.

6. ——: Buying Property From Himself or Investing in His Own Name.  The trustee cannot lawfully buy his own property from himself for the purpose of the trust.  Nor can he buy bonds in his own name, and afterwards transfer them to the trust estate and pay himself out of the trust fund.  Nor does it make any difference that the sale is intrinsically a fair one and for a full consideration.  A trustee who invests trust funds in his own name violates a rule which equity has established to secure such funds from mismanagement and waste and becomes personally responsible.

7. ——: Investment in Personal Securities.  It is not a sound discretion for a trustee to invest the trust fund in mere personal securities, or to subscribe trust funds to new enterprises of which the result is necessarily experimental.  It is not a sound discretion to invest trust funds in the bonds of a corporation organized for the purpose of constructing an independent railroad bridge across the Mississippi River at Alton, Illinois, the bonds being "predicated" upon a supposed unsecured personal contract of a single railroad

company to use the bridge for crossing trains when it should be completed. The trustee should be required to take the bonds, and account for the money invested in them, with interest on the face of the bonds.

8. **TRUSTEE'S COMPENSATION: For Administering Corpus of Estate.** Even though the trust instrument allows the trustee a commission upon and to be paid out of the body of the estate, a court of equity may exercise a discretion as to whether such compensation will be allowed, and where the trustee has been guilty of misconduct, which proceeded not from honest ignorance, but from a desire to use his fiduciary relation for his own profit, and in the pursuit of such desire has been guilty of actual fraud, and has resisted at every step the beneficiary's suit to recover his property, putting him to long and expensive litigation, the trustee will not, upon being removed, be allowed any commission on the *corpus* of the trust estate, whether realty or personalty.

9. ————: **On Income: Five Per Cent.** With the trust fund restored to a productive condition, and the trust instrument allowing him compensation on the income of the fund, the trustee should, in this case, be allowed compensation at the rate of five per cent on the gross amount of the income during his administration, even though he has been guilty of actual fraud in managing the *corpus* of the estate and in other respects has not invested it according to equity rules.

10. ————: **Conversion: Interest as Penalty.** Where the uninvested part of the trust fund was deposited in a bank to the credit of the real estate firm of which the trustee was a member, and the credit balance of the account was always in excess of the amount of such uninvested part, and the trustee used reasonable care to keep the fund invested, and there is nothing in the circumstances to indicate that the trustee was guilty of a wilful violation of the general rule forbidding the mingling of trust funds with his own, he should be required to account for the actual interest earned by the part of the trust fund so deposited, but should not be held as for conversion and required to pay as a penalty the legal rate of interest.

11. ————: **Interest on Fund Loaned to Trustee's Corporation.** The loaning of the trust fund by the trustee to a real estate corporation one half of whose stock is owned by him, is not necessarily equivalent to the use of the money by the trustee in his own business; and interest, the trustee is not, in this case, chargeable with the profits the corporation makes, or with compound legal interest as a penalty.

12. ————: ————: **Commission for Making Loans.** And where the loans were made to such corporation and renewed by the trustee without the intervention of a broker, but directly, the trustee should not be charged with the commissions customarily charged by brokers for making and renewing loans.

Cornet v. Cornet.

13. ——: ——: ——: **Made from Trust Fund: Right of Partner.**
Where the real estate firm of which the trustee was a partner made
a loan of the trust fund, the partner having no personal connection
with the transaction, which was consummated by the trustee alone,
whatever settlement was made between them cannot be used to
determine the right of the trustee to be allowed one-half of the
commission charged to the trust fund and received by the firm for
making the loan.

14. ——: ——: ——: **Covered by General Commission.** Where the
trust instrument provided only for the payment of actual expenses
and reasonable compensation, and the trustee is allowed five per
cent upon the gross income, he cannot be allowed an additional
commission for loans of trust funds made by the firm of which he
is a partner.

Appeal from St. Louis City Circuit Court.—*Hon.
Kent K. Koerner,* Judge.

REVERSED AND REMANDED (*with directions*).

*Ryan & Thompson* for plaintiffs.

(1) The trustee's conduct being questioned, the bur-
den is upon him to show that his investments were
proper. Hart's Estate, 203 Pa. St. 486. (2) It is
the duty of the trustee to invest the funds of the
trust estate within a reasonable time. Perry on Trusts
(6 Ed.) sec 462; Underhill on Trusts, pp. 266-446;
Beach, Trust and Trustees, sec. 552; Barney v. Saun-
ders, 16 How. 543; Ringgold v. Ringgold, 1 H. & G.
11; Witner's Appeal, 87 Pa. St. 120. (3) The ming-
ling by the trustee of trust moneys with his own is a
conversion by him of such trust moneys and he should
be charged with compound interest thereon for the
time during which they were so commingled. And
it matters not that he was at all times in readiness
to pay. State ex rel. v. Elliott, 157 Mo. 609; 28 Am.
& Eng. Ency. Law, pp. 1, 1088, 1081; 17 Ibid., 457, 474;
Bobb v. Bobb, 89 Mo. 421; In re Assignment of Mur-
dock v. Dickinson, 129 Mo. 499; Bates v. Hamilton,
144 Mo. 15; Pullis v. Somerville, 218 Mo. 637; Camp
v. Camp, 6 Mo. App. 563, 74 Mo. 192; Frist v. Win-
ston, 32 Mo. 489; Perry Trusts (6 Ed.), sec.

464. (4) The trust estate is entitled to the benefit of commissions charged third persons by the trustee for lending to them moneys of the trust estate. Hawkins v. Cunningham, 67 Mo. 415; Gamble v. Gibson, 59 Mo. 593; Condict v. Fowler, 47 Mo. App. 514. (5) It appearing that no services as trustee, under the direction of the will, were performed by Henry L. Cornet, but that all he did was done under the trust instrument of January 14, 1892, he is entitled to no commissions whatever and, having been removed as trustee for fraudulent misconduct, he has forfeited the right to commissions. Cornet v. Cornet, 248 Mo. 240; Barney v. Saunders, 16 How. 535-542; 28 Am. & Eng. Ency. of Law, 1038; Beach on Trusts and Trustees, sec. 737, p. 1692; Tracy v. Railroad, 13 Mo. App. 295, 84 Mo. 210; Kemp v. Foster, 22 Mo. App. 649; State to use v. Richardson, 29 Mo. App. 603; Van Raalte v. Epstein, 202 Mo. 196. (6) Commissions should not be allowed a trustee upon property turned over by him to a successor and of which he has been deforced for fraudulent misconduct. Garrison v. Trust Co., 77 Mo. App. 333; Hawkins v. Cunningham, 67 Mo. 415. (7) Though the authority given the trustee in the instrument creating the trust be given in broad and general terms, such as authority to invest according to "his best judgment," or, "within his discretion," or "as he shall deem best," or, "as I might do if living," yet such terms do not confer upon the trustee absolute and uncontrollable powers, but on the contrary they imply a duty to execute the trust in accordance with existing laws governing investments by trustees and require him to select investments from those which are recognized as legal. Drake v. Crane, 127 Mo. 106; Garesche v. Levering Inv. Co., 146 Mo. 446; McKinney on Liab. of Trustees for Invs., secs. 5, 6; 17 Am. & Eng. Ency. Law, 436-8; Pabst v. Goodrich, 122 Wis. 43; Mattock v. Moulton, 84 Me. 551; Davis, Appellant, 183 Mass. 502; In Hart's Estate, 203 Pa. St. 486; Clark v. Beers, 61 Conn. 87; Matter of Reed, 45 N. Y. App. Div. 200. (8) In the absence of specific

Cornet v. Cornet.

authorization given by the instrument creating the trust, the right of the trustee to invest the. trust funds in corporate bonds is doubtful. In no state is such investment sanctioned unless the bonds are ''seasoned'' bonds of long and well established, standard and leading corporations. McKinney on Liability of Tr. for Invs., sec. 2; Perry on Trusts (6 Ed.), sec. 452; 39 Cyc. 401; 17 Am. & Eng. Ency. Law, 452. (9) Never, unless in the presence of a clear and strong necessity, or in pursuance of specific authority granted by the instrument creating the trust, or by statute, may the trustee invest the trust funds in securities located in states other than the state where the trust is being administered. McKinney on Liab. of Trus. for Invs., sec. 6; Perry on Trusts & Trustees (6 Ed.), secs. 460, 452; 39 Cyc. 392; 17 Am. & Eng. Ency. Law, 454; Ormiston v. Olcott, 84 N. Y. 339; McCullough v. Mc-Cullough, 44 N. J. Eq. 313; Pabst v. Goodrich, 133 Wis. 43; Macy v. Mercantile Tr. Co., 68 N. J. Eq. 235; Thayer v. Dewey, 185 Mass. 68; Clark v. Clark, 50 N. Y. Supp. 1041; Guldey's Est., 201 Pa. St. 491; Collins v. Gooch, 97 N. C. 186; Matter of Denton v. Sanford, 103 N. Y. 607. (10) He should be required to refund the sums improperly invested and let him take the security. 17 Am. & Eng. Ency. Law, 466. (11) The new trustee cannot be made to accept doubtful security. Matter of Craven, 43 N. J. Eq. 416.

*Smith & Pearcy* for defendants.

(1) The trustees should have been allowed credit for sums paid out . for attorney's fees and expense of litigation in the suit to construe the will and also in this proceeding. Albert v. Sanford, 201 Mo. 132; Drake v. Crane, 66 Mo. App. 495; Ingraham v. Ingraham, 169 Ill. 471; Hitchcock v. Board of Missions, 175 Ill. App. 100; Charter v. Charter, L. R. 7 H. L. 387; Monks v. Monks, 7 Allen, 406; Loring v. Thorndike, 5 Allen, 270; Straw v. Societies, 67 Me. 495; Lassiter v. Travis, 98 Tenn. 330; In re Blair, 28 Misc. (N. Y.) 611, 59 N. Y. Supp. 1090; Deane v. Home

for Aged Colored Women, 111 Mass. 135; Morse v. Stearns, 131 Mass. 391; Jacobus v. Jacobus, 20 N. J. Eq. 54; Singer v. Taylor, 90 Kas. 285. (2) The costs should have been taxed against the trust es- tate. Bridges v. Sheldon, 7 Fed. 17; Bender v. Zim- merman, 135 Mo. 58; Kittredge v. Chillicothe L. & B. Assn., 103 Mo. App. 365; Eckford v. Eckford, 53 N. W. (Iowa) 351; In re Washbon, 14 N. Y. Supp. 674; Tiffany v. Emmet, 24 R. I. 420; Powers v. Jeudevine, 61 Vt. 587, 7 L. R. A. 523; Clifford v. Stewart, 95 Me. 48; Lombard v. Witbeck, 173 Ill. 413; Missionary So- ciety v. Mead, 131 Ill. 375; Bryson v. Bryson, 2 Hill Eq. 113. By far the greater part of the costs in this case relate to the taking of testimony and consider- ing points raised by the plaintiffs which were found against plaintiffs. Clearly these costs should not be charged against the defendant. (3) Full commis- sions should have been allowed on loans and the sale of real estate and upon turning over the *corpus* of personalty, and the proceeds derived from real estate.

BROWN, C.—This suit was instituted in the St. Louis City Circuit Court on the 13th day of June, 1908, by a petition in equity filed by George A. Cornet and Tillie Cornet, his wife, against Henry L. Cornet as trustee under the last will of Francis Cornet, de- ceased, and in his individual capacity. The relief asked was that the court decree that plaintiff George A. Cor- net was entitled to appoint and dispose of the estate devised and bequeathed to him in said will by his father, the testator therein; that a certain deed exe- cuted by the said George A. Cornet to the defendant, his brother, dated January 14, 1892, be cancelled and declared void for fraud; that the defendant be removed as trustee under said will; that an accounting be taken of the trust estate, and that the defendant pay over to the said George A. Cornet what shall appear to be due to him upon such accounting.

The answer put in issue the fraud charged in the petition and averred that the instrument of January

Cornet v. Cornet.

14th was made in full recognition of the terms and provisions of said will as giving to the said George A. Cornet only the net income from the share of the testator's estate left to defendant in trust for him during his life and that defendant accepted said trust and ever since continued to discharge his duties thereunder.

The cause having been put at issue by replication, was tried and the bill dismissed upon the merits. An appeal was taken by the plaintiffs to this court, where, upon hearing, the judgment dismissing the bill was reversed and the cause remanded to the St. Louis Circuit Court with directions that the said deed of January 14, 1892, be set aside; that the defendant be removed as trustee; that a successor be appointed to administer the trust according to the provisions of the will and that an accounting be had as prayed.

The opinion of this court, with its directions, setting forth the issues and findings in detail is published in the 248th Missouri Report at pages 184 to 243 inclusive. This renders it not only unnecessary but improper that we should incumber our records with a restatement of the same matters to which we shall refer in this opinion.

Upon the return of the cause and on June 20, 1913, the circuit court entered its decree in accordance with the directions of this court cancelling the deed of January 14, 1892, removing the defendant as trustee under the will of Francis Cornet, appointing the St. Louis Union Trust Company successor to the trust, and appointing B. D. Kribben, Esq., special master to settle the accounts of the removed trustee and determine all issues relating thereto. Thereupon the new trustee entered its appearance, accepted the appointment, and is appellant and respondent in connection with the original plaintiffs. This court directed, and it was, in pursuance of such direction, ordered, among other things: "That said Henry L. Cornet be allowed the legitimate expenses paid or incurred by him as such trustee on account of said trust property, in-

269 Mo.—20

cluding reasonable compensation for whatever serv-
ices he has performed for the trust estate under the
direction of said will, and be allowed credit for all
proper disbursements from said property made by him to
the said George A. Cornet or for the latter's benefit."
The concluding paragraph of said interlocutory decree
is as follows: "It is further ordered by the court
that all of the costs of this proceeding as well as the
cost of said accounting herein ordered and taken, be
taxed against and paid by the said Henry L. Cornet."

The will of Francis Cornet was executed January
31, 1891, and the testator died December 20th of the
same year in his seventy-second year, leaving surviving
him his widow and six children, including the plaintiff
George A. Cornet and the defendant Henry L. Cor-
net.

The defendant took possession of his estate, both
real and personal, of which the share of George A.
Cornet was one-seventh. Upon the division of the
personal estate, the defendant, as his trustee, re-
ceived Leavenworth bonds of the par value of four-
teen thousand dollars, with accrued interest amount-
ing to three hundred and three dollars and thirty-
three cents; Ray County bonds of the par value of
twenty-five hundred dollars, with one hundred and
forty dollars interest accrued; and one hundred and
thirty-five dollars and ninety-seven cents in cash,
aggregating $17,079.30. After the execution of the
deed of January 14, 1892, he proceeded from time
to time to sell real estate devised by the will, realizing
for the share of George A. Cornet $7629.20. These
amounts, aggregating $24,708.50, constitute the in-
vestment fund in the hands of the defendant trustee,
which, with the income of real estate unsold (some of
which still remains undisposed of), constitute the sub-
ject of the accounting, to which all the errors assigned
by parties to this appeal are directed.

The defendant testified in his own behalf in the
hearing before the master. He said, in substance,
that he was, during the time covered by the trust, a

member of the firm of Cornet & Zeibig, a partner-
ship engaged in the real estate anl loan business, com-
posed of himself and Mr. F. G. Zeibig, having equal
interests.  The Standard Realty Company was a cor-
poration organized by them and of which they owned
the stock in equal proportions.  It was engaged in
the real estate business.  Cornet & Zeibig kept a
single bank account, in which all the trust funds held
by defendant, of which there were others than the
fund in controversy, were deposited, and paid out on
the checks of the partnership; and loans of such funds
by defendant were charged to his account on the part-
nership books, while loans made by the firm went
to the account of bills receivable.  Sometimes Mr.
Cornet would purchase a number of bonds in a single
transaction and then distribute them among the funds
he had on hand for investment.  He bought fifteen or
twenty of the Jalisco bonds, which we shall have fur-
ther occasion to mention, distributing them among
these funds.  For several years Cornet & Zeibig had
received interest from its bankers on average monthly
balances at the rate of two per cent credited to the
account monthly.  At all times during these trans-
actions there was sufficient funds of the partnership
account to make good the trust funds in defendant's
hands for investment.  It was contended by the de-
fendant upon the hearing that the amount paid by him
for attorney's fees and expenses of this entire litiga-
tion, amounting, with interest, to $1128.57, together with
the costs of the accounting, amounting to $1326.50,
and all taxable costs of this proceeding should be ad-
judged and taxed against the trust estate.  These con-
tentions were disallowed by the master and all taxa-
ble costs were adjudged against the defendant.

Certain loans were made through the office of Cor-
net & Zeibig for which commissions were charged by
that firm against the trust fund, amounting to $298.75.
This was disposed of by the special master in his re-
port as follows:

"Your special commissioner finds that the · trustee received one-half of these commissions in the distribution of the profits of the firm of Cornet & Zeibig, and that he is not entitled thereto and should be excluded therefrom, but that he is entitled to credit in his accounting to the other half thereof which Zeibig received for his services, amounting to $149.38."

The plaintiff contends that the trustee should not only be charged with interest at the rate of six per cent per annum, compounded annually, on the loans made to the Standard Realty Company, but he should also be charged with the further sum of $260.50 which seems to be admitted as the amount of the usual commissions charged to borrowers by loan brokers for obtaining such loans, and renewals thereof. This was disallowed by the special master in his report.

The special master charged the trustee with the amount of interest received by Cornet & Zeibig on the amount of the trust fund included in their average monthly bank balances, but refused to charge interest at the legal rate, either simple or compound, for which the plaintiff contended. He allowed the trustee. commission at the rate of five per cent on the income from investments of the personal property received by him under the will, amounting to $899.08, and also commission at the rate of two-and-a-half per cent on the *corpus* of the personal estate turned over to. the new trustee, amounting to $426.18.

Among the investments made by the trustee were certain bonds called the Alton Bridge bonds; being two bonds, each of the par value of $1000, bearing interest at five per cent. purchased by him in 1894 for $1840, making an income rate of five and twenty-eight hundredths per cent. These were a part of an authorized issue of $1,000,000, of which $600,000 at least were sold, and were secured by first mortgage on a railway bridge with its terminal, under construction across the Mississippi River at Alton, Illinois. Its prospect of earnings consisted of what is called in the record a "contract" with the Chicago, Burlington & Quincy

Railroad Company to use it, which was expected to yield a gross income of $80,000 per year. The bridge was completed and was used for about three years, when the Burlington refused to further carry out the arrangement, and the property went into the hands of a receiver. It was reorganized in 1901 with an issue of four per cent bonds, which were substituted for the original bonds and accrued interest. At the time of the hearing these bonds were worth about seventy-five per cent of their face. The plaintiff insisted that the trustee be required to take these bonds from the estate, at cost and interest. The special master thought differently, and reported that they be allowed the trustee as an investment.

Another investment for which the defendant trustee sought credit consisted of nine bonds of $1000 each, bearing interest at six per cent, purchased by him for $9,555. These bonds were purchased at various times between March 1, 1900, and November 27, 1906, inclusive. They were a part of an issue of $1,500,000 by the State of Jalisco, Mexico, to aid the city of Guadalajara in that state, in the construction of a municipal water-plant, and seemed to have been founded upon bonds of the city in an equal amount. Interest payment had been stopped on these bonds under circumstances which are lightly touched upon in the testimony, but enough is disclosed to indicate that it was payable in gold in New York City, and that some law had been enacted in Mexico discouraging the exportation of gold, which rendered the rate of exchange so high that the state refused to transfer it. The special master found that these bonds were not a proper investment and ought not to be charged against the trust estate, but that their cost, with unpaid interest, should be charged to the trustee, who would thereby become entitled to the securities. The court sustained an exception of the defendant to this recommendation, and allowed them as a credit to the trustee.

It sustained the findings and recommendations of the special master in all other respects.

The defendant in his appeal assigned as error the action of the court:

(1) In refusing to allow him credit as against the trust fund for the costs and expenses of this litigation as already stated.

(2) In not allowing him credit for all sums received by Cornet & Zeibig for making loans for the trustee.

(3) In refusing to allow him compensation for the sale of real estate.

(4) In refusing to allow him commission upon the *corpus* of the fund derived from the sale of real estate.

The errors assigned by the plaintiffs, including the St. Louis Union Trust Company, are:

(1) In refusing to charge the trustee with either compound or simple interest on the uninvested assets of the trust estate remaining in his hands from time to time, as we have stated.

(2) In refusing to charge the trustee with compound interest on the Standard Realty Company loans.

(3) In refusing to charge the trustee with commissions of two and one-half per cent on loans and one per cent on renewals made by him to the Standard Realty Company.

(4) In refusing to charge the trustee with the entire commissions received by Cornet & Zeibig for making the loans to which we have already referred.

(5) In allowing the trustee compensation by way of commissions, amounting to $898, on income from his investments of the personalty, and $446.18 by way of commission on the corpus of the personal estate turned over to the new trustee.

(6) The refusal of the court to order that the trustee make good the investment in the Alton Bridge bonds.

(7) The refusal of the court to require the trustee to make good the Jalisco bonds.

I. The defendant insists that the nature of this suit requires that not only its taxable costs, but all

the legitimate expenses incurred in his resistance to the relief sought by the plaintiffs, should be charged against and paid out of the trust fund in his hands. This is true if these costs and expenses were incurred by him for the benefit or protection of the fund, and this depends upon the nature of the suit, the object of the parties to its prosecution and defense, and their respective rights as they may be determined by the court.

**Costs.**

The defendant says that this is essentially a suit to secure a construction of the Francis Cornet will for his guidance in the administration of the trust. Every suit at law or in equity, involving a title or right depending upon the meaning of a will, involves also its construction; yet such a suit does not involve the special jurisdiction of a court of equity in construing wills. If it did, the unsuccessful defendant in ejectment or in a suit to quiet title would often be entitled to have his costs taxed against the property involved. The construction of the will in such cases is simply in the redress of the wrong charged; whether the suit be at law or in equity. It has been truly said "that the special equitable jurisdiction to construe wills is simply an incident of the general jurisdiction over trusts," and that the courts exercise such jurisdiction when it is moved on behalf of an executor, trustee, or *cestui que trust,* to insure a correct administration of the power conferred by a will. [Pomeroy's Equity Jurisprudence (3 Ed.), sec. 1156 and cases cited.]

The twofold purpose of this suit was to set aside a deed obtained by the defendant trustee from his brother, for alleged fraud in securing its execution, and to remove the trustee on account of the fraud. An accounting by the trustee to his successor or his beneficiary was a necessary incident of this latter remedy. There is nothing in it calling for the exercise of the special jurisdiction of the court to construe wills. It required only the exercise of the general jurisdiction of courts of equity over trusts and trus-

tees by removing a trustee for misconduct and fraud in connection with his trust.

It is not necessary that we go into the details of the fraud, for all questions as to that have been put at rest by the former judgment of this court. [Cornet v. Cornet, 248 Mo. 184.] The only feature of the will which concerns us is the attempt of an affectionate father to protect a son who was subject to the alcoholic mania to such an extent that he would periodically unfit himself for the transaction of business, and, like most other people similarly afflicted, become improvident and rash in his expenditures. There is nothing in the evidence which seems to indicate that he had become a helpless inebriate, or that his father, at any time while living, despaired of his reformation. He had another son, the defendant, whose habits seem to have been unexceptionable, and who had for more than ten years been engaged in the loan and real estate business, and was intelligent and active. Under these circumstances the father made the will in question, and his policy toward his less fortunate son, plainly expressed in that instrument, was to confide to the care of the more fortunate and capable one the possession and management of the equal share of his property he desired to leave to the other, so that he would, neither by neglect nor improvidence, be without some means of support during his life. The father evidently contemplated that he might marry and have children and issue of his own, and used, in providing for the succession, the broad words of inheritance prescribed by the common law for the creation of a fee. The use of any words conferring a title upon the trustee, or power of disposition over the realty, was carefully avoided, and the door of opportunity for a normal life was left carefully open.

The principal fraud charged in this case was, in substance, that the defendant, in procuring the deed of January 14, 1892, had fraudulently taken advantage of the fiduciary relation to his brother George created by the will, to secure from the latter the legal title in

fee, together with the absolute power of disposition over the estate left him by his father, as well as that which he might thereafter receive through his brothers and sisters, and to reinvest the proceeds in real or personal property as he should see fit, subject to the same trust, and at his death to be equally divided among his heirs at law *per stirpes*; none of which rights or powers were conferred by the will. We held, that independently of the presumption arising from the fiduciary relation, the record showed actual fraud in procuring that deed for which it must be set aside, and the defendant removed from the trust. The deed itself was replete with untrue statements with reference to the rights both of the beneficiary and the trustee under the will, while the testimony exhibited circumstances of advantage taken of the weakness and dependence of the beneficiary which appealed strongly to this court.

These questions could not be determined without examining and construing the will for the purpose of determining to what extent the defendant had violated the trust with which it had clothed him. He had absorbed the title to all the property, both real and personal, leaving his beneficiary with no interest whatever except the bare right to receive such portion of the income as he should see fit to pay him, instead of investing it otherwise, as permitted by the fifth clause of the will. It put his nose to the grindstone, if we may be allowed so homely an expression, and enabled his trustee to keep it there until the time when he himself would perhaps participate as heir in what was left. If the will itself did all these things then the deed was harmless and the construction of the will constituted the principal task of the court in this case, and the disposition to be made of the deed itself the principal duty.

The defendant, so far from joining in a request for such construction and showing a disposition to regulate his administration of the trust accordingly, repudiated the trust by the fraudulent deed under which

he proceeded to sell the real estate and defended his action to the last ditch in this court, insisting in his answer that he was acting under both the deed and the will, and is now seeking to make his beneficiary pay the costs which he incurred and the attorney's fees which he paid in making the fight against his own removal for misconduct. It is unnecessary to give further reasons for the conclusion that he will not be permitted to do this. The action of the circuit court in confirming the report of the special master in this respect is approved.

II.   The question whether the defendant is entitled to have the costs incident to the accounting taxed against the trust fund deserves a word of special mention. As we have already said, and as his answer states, he assumed the duties of trustee

Compensation for Gratuitous Administration. both under the will and the fraudulent deed, the latter constituting his only authority for the sale and conveyance of the real estate, and having no excuse for its existence other than to obtain a stronger hold upon the fund, that it might result in some personal benefit to himself should his more unfortunate brother die without issue. He contended for the success of his plan in this suit to the end. It appealed to him so strongly that he even concluded, as he states in his answer, to administer the self-created fund without compensation, and continued to do so until the court decreed his removal. It was only then that he reached back to reclaim, in his accounting, the price he had been willing to pay for the acquiescence in the violation of his trust. His removal brought upon him the burden of accounting to his successor; a burden which he now seeks to impose upon his brother, through the trust fund, on the ground that his removal involved the construction of the will which he had already construed against himself by obtaining the deed necessary to conform it to his own plan. We find no authority for taxing upon a trust fund the expense incurred sole-

ly by the violation of the trust under which it is held. The circuit court was clearly right in its disposition of ·this question.

III.   The trial court properly held, and the decree was framed upon the theory, that the sale of the real estate derived through the will of Francis Cornet for the aggregate sum of $7529.20 was a violation of the terms of that instrument for which
<span style="margin-left:2em">Sale of Real Estate.</span> the trustee was entitled to no compensation.   The instrument had been made by the father, and his will clearly required, so far as the trustee was concerned, that it should be continued in the same form.   So far as the title had been conveyed under the fraudulent deed it was the duty of the trustee to make it good in money without deduction, and this he seems to have done with the proceeds, which seems satisfactory to all parties.   This was the natural and necessary result of our former decision, and, although error was assigned by defendant, the point has not been pressed here, and we therefore take for granted that the correctness of this action is conceded, and will so assume.

IV.   The amount of the personal estate distributed to defendant as trustee for George under the will and to which this accounting particularly relates, was $17,079.30, consisting of Leavenworth bonds and bonds of Ray County, Missouri, and $135.97 in cash.   The
<span style="margin-left:2em">Investment of Trust Funds.</span> bonds, with interest, were all called and paid in due time, so that the entire trust fund was equivalent in value to cash, and bore interest from the date of the settlement of the estate, December 6, 1892.   The master's report, which exhibited the final condition of the trust fund, includes a period of about twenty years of its administration.   The income of the fund had, in the meantime, amounted to $17,981.78, and the corpus of the estate consisted, at the end of that time, of one real estate mortgage of $2500, and certain bonds, making an ag-

gregate of $16,947.72. This income was slightly in excess of five per cent per annum.

If the amount of the corpus of the fund now on hand is as well invested as was the fund received by the trustee in 1892, his administration has been creditable, the amount of loss of capital negligible, and reasonable claims for compensation for services in producing such a satisfactory condition would be founded in substantial equities.

It is said, however, that the present condition of the fund is unsatisfactory, and that an amount equal to more than seventy-six per cent of this entire personal estate is invested in securities which have ceased to be productive and are now in great jeopardy. This complaint refers to the "Jalisco" bonds, representing an investment of $9555, and the "Alton Bridge" bonds, representing an investment of $1840. Both the plaintiffs and the appellant trustee contend that neither of these investments is such as a court of equity will approve for trust funds of this character, and that the defendant should be required to take them for his own account, and to reimburse the fund with cash. In determining this question we should proceed with the utmost care, for whatever we may say will, no doubt, be invoked for the guidance and protection of other trustees or their beneficiaries, not only in this jurisdiction, but wherever our utterances receive consideration.

The will contained no special direction with respect to investments. It simply directed the trustee "to manage such trust fund, and to make the same productive in such manner as he may deem most safe and advantageous." It is not nor can it be said that this conferred any other or different power than to use his best judgment in investing in such securities as are approved by the rules of equity as investments for trust funds, and the testator carefully recognized one of those rules by prescribing *safety* as the first element to be considered.

Cornet v. Cornet.

The defendant says that the rule governing the conduct of the trustee in that respect, as he understands it, "is that he must exercise such prudence and diligence in conducting the affairs of the trust as men of, average prudence and discretion would employ in their own affairs." This is true so far as it goes, but it refers to such investments only as trustees may make *of the funds of others.* In dealing with his own the most prudent of men may grow rich by the process of discounting personal notes or commercial paper, but, as was said by Lord KENYON in Holmes v. Dring, 2 Cox, 1: "It was never heard of that a trustee could lend an infant's money on private security. This is a rule that should be rung in the ears of every person who acts in the character of trustee, for such an act may very probably be done with the best and honestest intention, yet no rule in a court of equity is so well established as this." And this is the rule, enforced with the same uniformity, in this country. [Perry on Trusts (6 Ed.), sec. 453.] It has also been laid down as a rule that "voluntary investments must not be made by a trustee beyond the jurisdiction of the court having charge of the trust, except in cases of necessity for the saving of the fund." [Perry on Trusts (6 Ed.), sec. 452.] The same author says (Sec. 460); "If there is a direction [in the trust instrument] to invest trust funds in real securities in a foreign jurisdiction, the court will allow the investment, but if no such power is given, such investment will not be allowed." And McKinney, in his recent work entitled Liability of Trustees for Investments, p. 12, sec. 6, says: "The general rule is that a trustee must invest in securities which are located in the state where the trust is to be administered." After stating that some of the states allow the practice in particular cases this author says: "In the absence, therefore, of specific authority, either in the trust instrument or by statute, a trustee would not be safe in placing the trust funds in securities which are beyond the jurisdiction of the court."

We do not express any opinion as to the rule applicable in this State to the investment of trust funds in landed securities of other states of our Union. The United States is one country, in which the inviolability of contracts is protected by one Constitution and in which resort may be had to its own courts in proper cases.

We have selected the foregoing instances of well established rules governing the investment of trust funds from many we might mention, to illustrate the application of the definition of "diligence and prudence" given us by defendant as applicable to these investments. It is tersely stated by the Supreme Court of Pennsylvania as follows: "Common skill and common prudence, as is said in the many cases cited, are all that the law demands of a trustee; that is, the common skill and prudence of an investor of money to be safely kept with such reasonable income as is commensurate with safety of the principal." [Hart's Estate, 203 Pa. St. l. c. 486.] It means the skill and prudence of the investor of money to be safely kept and invested for others. In Mattocks v. Moulton, 84 Me. 545, the Supreme Court of Maine expressed the same idea as follows: "True, she left the investment of the trust estate to his judgment, but it was to his judgment as trustee, enlightened and guided by the approved rules applicable to the investment of trust funds, not to his uninformed, personal judgment exercised without reference to legal rules and principles." It goes without saying that in making these investments the first element to be considered is *safety*. This does not mean simply that in the honest course of events the security will be paid. It means that its payment may be enforced through the operation of governmental power to which the trustee has rightful access, and without recourse to the laws and governmental machinery of foreign nations. Without this element of value the subordinate one of income becomes uncertain.

V. Without determining or intimating whether the obligations of a foreign government or its subordinate subdivisions or municipal agencies may or may not, under *possible circumstances,* be a proper investment for more than one-half of a small trust fund like the one in question, we will apply the principles we have stated to the investment in Jalisco bonds. That the defendant has failed or ‵neglected to direct our attention to any instance in this country where an investment of that character for trust funds under a similar power has met with judicial approval, impresses us with the conviction that the general rule forbidding. such investments has met with general acquiescence. The legislative policy of our State, under which trust companies have been established with power to execute similar trusts, seems also to have been to confine the investment of the trust funds in their charge in such securities in our own country. Section 1132 of the Revised Statutes of 1909, which covers this question, provides that the directors of all such corporations "shall have power of investing the moneys placed in their charge in loans secured by real estate or other sufficient collateral security, in public bonds of the United States, or of this State, or in the bonds or stock of any incorporated city or county in this State."

It will not be. contended for a moment that the fact that the credit of our sister Republic of Mexico, or of the States which composed that Federation, was such that they were compelled to pay a higher rate of interest than that prevailing in our own country would be a good reason for a trustee to seek investments there. The record is meager with respect to other reasons. It seems that Little & Hays, brokers of St. Louis, had $300,000 of these bonds for sale and recommended them highly, both by word of mouth and in a circular; that the Mississippi Valley Trust Company was interested as an equal partner in the profit of these sales and also recommended them, and placed one or more of them in one of its trust funds;

Investments in Foreign Nations.

that the Franklin Bank was also a purchaser from Little & Hays, but whether or not it was also interested in their sales does not appear. The evidence shows that one or two other persons said to have good business ability were purchasers on their own account, but to what extent does not appear. It is fair to say that the evidence was slight as to the reputation of these securities and there is nothing to show a necessity for making the investment.

The defendant does say, however, in praise of the securities, that at the time they were bought "President Diaz was in undisputed command of the situation in Mexico, and in so far as the most prudent investors could see, bonds of the rich State of Jalisco were as safe an investment as bonds of any American State." We understand from this, his contention to be that President Diaz in the saddle so seasoned the credit of that country that it justified him in going thousands of miles into a foreign country and among a strange people to obtain for his brother an investment in six per cent bonds at a premium of six points. This justifies a word as to the attractive financial conditions involved in the supremacy of the distinguished President in control.

The repudiation by Mexico of interest on its public debt in 1861 is remembered by some of us. More of us remember the train of woes more direful and numerous than those that the elopement of the fair and fickle Helen brought upon her own unfortunate country, which followed. Maximillian came and went. The interest was paid in the blood of the people, and Diaz came into politics as opponent of Juarez, his chief, in the election for President and was defeated. When Juarez died and his successor had been fairly elected Diaz took the field against him at the head of a great army, driving him from the country, and making himself provisional president; and in that capacity, in 1877, elected himself President under a constitutional provision which limited him to one consecutive term. This he obeyed, retiring until the next election, was

then re-elected, and from that time for about thirty years, by amendments to the constitution and elections held under military supervision, maintained himself in that office, in command of the situation. At the time these bonds were issued mutterings of discontent filled the country. From that time until this defendant made his last purchase of these bonds in 1906, the people, wherever they dared to speak, were complaining of. the rapacity of the officials; of the farcial·character of his election; of the gathering into great estates, some of which consisted of millions of acres, of lands which they said should be available as homes for the people, who were reduced to a condition of peonage; and in 1904, two years before defendant's last purchase, they complained that Ramon Corral, who was then elected Vice-President, had been selected by the President to perpetuate the autocracy. As soon afterward as 1908 young Madero issued his book on the Presidential Succession, and the people were rapidly gathered into the impending revolution. Deserted by Limantour, the minister who founded and builded the financial structure with which we are dealing, Diaz and Corral were both driven from the country, while the life of Madero was sacrificed to his sentimental enthusiasm for reform. The Autocrat "in undisputed command of the situation in Mexico," the dreamer, the butcher, rapidly succeeded each other, and now the adventurer and the bandit are treading the wine press together. We may take these matters into consideration because they are matters of world history, and many Americans, looking for speculative investment in Mexico during the last fifteen or twenty years, have seen and felt these forces at work. Such conditions do not appeal strangely to Americans, who are in the habit of assuming, without question, that the stability of republican government rests in the loyalty and cooperation of a people accustomed to political liberty.

There is no doubt that the defendant was perfectly honest in his faith in the Diaz regime when making this investment, but the evidence shows that he was not

addicted to taking the advice of his beneficiary in such matters, and we see a reason to depart, for his benefit, from those general rules which the law has prescribed for the protection of those not in a position to protect themselves. It is no hardship for him to take these securities on his own account. If Mexico should become tranquil, and the investment should turn out a good one, the beneficiary, by his course in this suit, has shown that he is perfectly willing that his trustee should reap the benefit. We therefore hold that the finding and recommendation of the special master that he should replace these bonds with cash should have been confirmed.

VI. In the matter of the Alton Bridge bonds we are forced to the same conclusion. It is a just and healthy rule that defendant's successor ought not to be compelled to accept an improvident investment (Craven's Case, 43 N. J. Eq. 416), and that, having been removed and the propriety of the investment questioned, the burden is upon him to show that it is a proper one, or that he exercised proper care and prudence in making it. [Hart's Estate, 203 Pa. 480, 486.] In making this investment the defendant violated various rules by which equity seeks to secure trust funds from mismanagement and waste. One of these rules is that the trustee who invests such funds in his own name becomes personally responsible. This is only a corollary of the rule that if he deals with the estate on his own account it must be at his own risk. Were he permitted to do otherwise it would place before him the constant temptation to make the trust fund a dumping ground for his own unsatisfactory ventures. In this case the defendant testifies that it was his habit to purchase securities in his own name, checking for payment on the bank account of his own firm, and afterwards to distribute them to various estates held by him in trust or to his own account as might be indicated by the condition of the various funds. In this case he purchased, on December

7, 1894, five of these five per cent Alton Bridge bonds, each of the par value of one thousand dollars, at ninety-two cents, two of which, being the same now in question, were afterward assigned to the George A. Cornet trust fund. When this was done is not clear, and we have not considered it necessary to scrutinize the complicated analytical statement of the condition of this fund presented by the master, which might give us light on this subject. It is not denied that the purchase of the five bonds was a single transaction for the personal account of the defendant and that the two bonds in question were at some subsequent time distributed to this fund. They belonged in the meantime to the trustee, who might at any time have disposed of them to the best advantage for his own personal account. The rule is imperative that a trustee cannot buy his own property from himself for the purpose of the trust. It makes no difference that the sale is intrinsically a fair one and for a full consideration. "The policy of equity is to remove every possible temptation from the trustee." [Pomeroy's Equity Jurisprudence (3 Ed.), sec. 958.]

We have already said that it is not a sound discretion for trustees to invest the trust fund in mere personal securities. Nor is it a sound discretion to subscribe trust funds to new enterprises of which the results are necessarily experimental. [1 Perry on Trusts (6 Ed.), sec. 459.] This investment violated both these rules. The corporation issuing the bonds was organized for the purpose of constructing an independent railway bridge across the Mississippi River at Alton, Illinois. It was purely experimental. The bonds were a part of the original capitalization to provide money for the erection, and the bridge was still incomplete. Whitaker & Company were the financial promoters of the scheme. According to the testimony of one of the members of that company the bonds were "predicated" upon a supposed unsecured personal contract with the Chicago, Burlington & Quincy Railway Company to use the bridge for crossing trains at that point when

it should be completed. Irrespective of its use by some railway corporation or corporations the material of which it was composed would be mere mass of stone and steel rendered valueless in its erection. The refusal of the railroad company to use it, which occurred three or four years after its completion, wiped out the income and placed it in the hands of a receiver. No attempt was made to enforce the Burlington contract so far as is shown by the record. Six hundred of these bonds were outstanding, with interest due and unpaid to January 2, 1901, amounting, including interest on unpaid coupons, to $148,317.78, or $247.20 on each bond. During that year a reorganization was effected under a plan by which $800,000 of new four-per-cent bonds were to be issued, $750,000 of which were to be used to take up the $600,000 of fives outstanding, at the rate of $1250 of the new bonds for each $1000 bond of the old issue, with all unpaid interest coupons attached. The defendant joined, surrendering his original bonds and taking four-per-cent bonds in their places. Two of these four-per-cent bonds, of one thousand dollars each, are the present investment.

The fate of the additional $500 of new bonds, issued, apparently, to equalize the interest of the fours and fives, was explained by the special master at the trial as follows: "There evidently was a reorganization of the concern in June, 1901, and on January 2, 1903, Mr. Cornet received $400 and $12.50 interest upon interest, which is accounted for down to the reorganization of the company, and there was substituted for those bonds other bonds at four per cent, which continued down to the present time. There were bonds issued in lieu of interest January 2, 1903; it must have been at the time of the reorganization, interest on the five-per-cent bonds and interest on delinquent interest was all accounted for." Thus the trustee paid himself the interest out of the principal of his security, and the two bonds now in the corpus of the fund represent what is left after the performance of this financial feat.

The defendant does not explain why he took his little trust fund into this reorganization, nor intimate that he made any attempt to have the investment in the insolvent corporation taken off his hands by the re-organization committee. It does not appear that the bridge was ever used or was available to any other railway company than the Burlington, which was using it at the time of the master's hearing under a tempo-rary contract favorable to itself, which it had forced by the threat to build a bridge of its own at that point. It was the only railway having physical connection with the bridge. The bonds were then worth seventy or seventy-five per cent of their face, Mr. Costigan, of Whitaker & Company, giving both figures in his testimony. The gross revenue of the bridge had been $205,689 during the year ending June 30, 1911, and had declined to $154,136 in the year ending June 30, 1913.

In making the original investment the defendant took no advice other than that of the promoting brokers. He did not consult his beneficiary—in fact he testifies that he never consulted him, *because he did not think he was obliged to under his trusteeship.* He chose ar-bitrarily to assume the entire responsibility.

While an independent bridge, founded upon the general traffic of a great commercial city like St. Louis, may be immensley profitable, the only evidence in the record upon that question applicable to this transaction is to the effect that such a project is uncertain and speculative; and when it is "predicated" on the promise of a single railway company to use it, we wonder why that company did not build it. It is unnecessary for us to enter this field of speculation. It is only neces-sary to say that we see no reason why the defendant's successor should be required or permitted to accept these bonds for his beneficiary, and we hold that the defendant must replace the money so invested, with interest at the rate of five per cent per annum on the face of the original bonds.

VII. The disposition of the foregoing questions enables us to consider the claim of the trustee for reasonable compensation for his services from the more favorable standpoint of a stable and substantial fund from which just claims of that character may be paid.

The first of these questions in natural order arises upon the assignment of error in the ruling of the trial court allowing compensation at the rate of two and one-half per cent on the amount of the corpus of the fund remaining on hand, for its care and preservation. For guidance in this respect, we must look to the provisions of the will which created the trust, appointed the trustee, and provided, in general terms, the rule for his compensation.

**Trustee's Compensation.**

The trial court following, in its interlocutory decree, the ruling of this court upon the former appeal, directed that the defendant "be allowed the legitimate expenses paid or incurred by him as such trustee on account of such trust property, including reasonable compensation for whatever services he has performed for the trust estate *under the direction of said will."* Going to the will itself for information on this point we find that it appointed the testator's widow and the defendant joint executors, and the defendant qualified and made final settlement, but we do not find that his co-executor joined with him in the execution of the will, and while the special master states in his report that he had examined the settlement we are not favored with any statement as to what it contains. We will assume therefore that they received the compensation allowed by statute for the administration of the entire personal estate.

The will, a copy of which is included in the report of this case upon the former appeal, to which we have already referred, contains two provisions on the subject of compensation. The first, in item three, refers only to the management of the real estate prior to its division among the devisees, and affords little light upon the question we are now considering. Item four provides,

in substance, that the personal estate should be divided
as soon as convenient among the testator's wife and
children in kind, and that until such division should
be made the defendant, as trustee, should account for
the income. Item five provides that the share going to
George A. Cornet, both of real and personal property,
shall be placed in the hands of defendant, in trust for
the benefit of said George A. Cornet, "to manage such
trust fund, and to make the same productive in such
manner as he may deem most safe and advantageous,
and the income thereof, after deducting the necessary
expenses and a reasonable compensation for his ser-
vices, to either pay over to the said George A. Cornet in
quarterly installments, or at his, said trustee's option,
to lay it out in such manner as he deem most beneficial
to said George A. Cornet, and after the decease of
George A. Cornet, said trust fund shall go to his heirs
in law and thereupon the trust shall cease."

This last item, it will be seen, covers the entire sub-
ject of the compensation of the trustee for the manage-
ment of both real and personal property. The testator
was careful to provide that both his expenses and
compensation were to be deducted from each quarterly
installment of the income as it should be paid, and was
equally careful to omit that requirement in providing
that upon the decease of the beneficiary the corpus of
the estate should go to his heirs. It was his evident
intention plainly expressed, that all expenses of ad-
ministration of the trust should be paid from the in-
come as it proceeded, and that the body of the fund
should be kept intact. The same language refers as
well to the real as to the personal estate, and leaves no
room to doubt the intention of the testator to apply the
same rule of compensation to both. We must assume
that the testator was aware of the legal right of the
executors to a commission on the amount of the entire
personal estate that went into their hands, and in the
light of such knowledge the scheme of compensation
which he provided seems to us to have been an in-
telligent and practical one; but should we construe the

will to permit us to allow the trustee, under proper circumstances, a commission upon and to be paid out of the body of the estate, we would still have to consider the right of defendant, under the circumstances of this case, to appeal to our discretion for that purpose. We have held, and the trial court has adjudged at our direction, that the defendant has been guilty of misconduct in relation to his trust. This misconduct has not been of the kind which proceeds from honest ignorance and manifests itself in an endeavor to protect the interest of his beneficiary. It proceeded rather from a desire to use the influence of his fiduciary relation that he himself might ultimately profit by the wrong. Instead of welcoming the interposition of a court of equity to guide him in his duty, he actively and vigorously opposed the interest of his beneficiary by asserting an adverse claim of his own, and sought vigorously to impose the expenses of the litigation which ensued wholly upon his beneficiary. The court, under such circumstances, could not rest upon a mere direction as to his future course, or stop at a mere rebuke, but removed him from his trust for a wrong already done, and placed in the hands of a disinterested trustee the fund he is now asking to deplete to the extent of a sum for compensation which he could only have earned by fidelity to his trust. The true rule in such cases is stated by Perry as follows: "If they are guilty of any breach of trust, or of any vexatious or improper conduct, the courts can withhold all compensation, or they can allow such compensation as will pay for the value of their services so far as they have been beneficial to the estates." [Perry on Trusts (6 Ed.), sec. 919.] The same rule is expressed by Beach in his Commentaries on the Law of Trusts and Trustees, sec. 737, as follows: "It is well established that a trustee is entitled to compensation only as he has faithfully discharged the duties of his trust. Where there has been a partial performance of duty that has been of value to the estate and a partial failure to execute the trust in a *bona fide* manner, he may be allowed a partial compensation. The

court will decree such compensation as, in view of all the circumstances, it shall deem just and proper." This is unquestionably the law of this State.

In this case a long and arduous litigation has been necessary to preserve and protect the rights of the beneficiary with reference to the matters involved in the trust, and we can do no less than to see that the corpus of the fund remains intact as the foundation of a more satisfactory administration. The item of compensation at the rate of two and a half per cent on the corpus of the estate, amounting to $426.18, will therefore be disallowed.

VIII. With the fund restored to a productive condition as we have indicated, we see no reason why the defendant should not be allowed compensation at the rate of five per cent on the gross amount of the income during the period of his administration, and the action of the trial court in the allowance of this item amounting to $773.56 is approved.

On Income.

IX. During the entire time the defendant acted as trustee of this fund he was the senior member of the firm of Cornet & Zeibig, real estate dealers and loan brokers, and the uninvested funds of this estate were deposited in bank in the general checking account of the firm. The undisputed evidence shows that the credit balance of this account was always in excess of the amount of uninvested funds of the estate. During the last five years of the administration the bank paid the firm two per cent interest on its monthly balances. The plaintiff contends that this amounted to a conversion of the trust fund and that the trustee should be charged compound or at least simple interest at the rate of six per cent per annum on these balances. This contention was disallowed, and the court allowed the interest actually received.

Conversion: Interest as Penalty.

This question should be considered in connection with the finding of the referee, in which, after a careful

examination of the evidence, we concur, that the trustee used reasonable care to keep the fund invested, and that it had not been used by the firm for its own profit otherwise than by the payment of interest on bank balances as above stated. We do not see how the trust fund lost anything by this practice. We are satisfied that the trustee was not guilty of the wilful violation of the general rule forbidding the mingling of the trust funds with his own. He was, we believe, simply ignorant that such rule existed. The imposition of a penalty on that account would necessarily be purely punitive, and not in any sense compensatory. This would be no less true because the penalty would inure to the beneficiary. While it would be our duty not only to compel the restoration of anything that might appear to have been lost by this practice but also to protect the beneficiary against possible wrong which might have been concealed by it, yet when punishment alone is involved our discretion should be used to avoid unnecessary hardship. The master was correct in his recommendation in this respect and the action of the court in confirming it is approved.

X. Cornet & Zeibig for the convenience of their business organized a corporation called the Standard Realty Company, of which they were the stockholders, having equal interests, for the purpose of dealing in real estate. The defendant made three loans to this concern, aggregating in amount $8300 at five-and-a-half and six per cent interest. These were re-newed from time to time and were finally paid off and the money otherwise invested. We assume that the interest was paid regularly and distributed as other income. No commission was paid to defendant or to Cornet & Zeibig on these loans, although it was usual for brokers placing the money of their customers in that class of securities to charge and receive a commission for their services of two and one-half per cent for original loans and one per cent for renewals, from

*Loaning Trust Funds to Trustee's Corporation.*

the borrower. This, however, was not a fixed rate, for, when the borrower refused to pay it the broker would take what he could get, sometimes as little as one per cent. This commission was not, of course, a necessary appendage to loans made without the intervention of a broker. That real estate loans form the most unquestionable of investments for trust funds is vigorously asserted by the plaintiffs throughout their brief. That these loans were perfectly secured and bore the highest rate of interest ordinarily obtainable for money in like amounts similarly secured is not denied. The plaintiff insists, however, that the transactions were equivalent to the use of the money by the trustee in his own business, which is contrary to the policy of the law, and ought never to be permitted with impunity; that if he does so he is accountable for any profits he may make, however great they may be, and that if he does not show the profit derived from such use, compound interest will be charged against him in order that it may be certain that the *cestui que trust* loses none of the profits of the transaction which the law can give him. [Bobb v. Bobb, 89 Mo. 411.]

As an abstract proposition this is a fair statement of the law, but it needs much trimming to fit it accurately to the proposition before us. The money was not used by the defendant, but was loaned to a corporation having a distinct entity both in fact and in law. Were the rule inflexibly applicable to such a case the loaning of trust money to a corporation in which the trustee owned a single share of stock would, however profitable and advantageous to the estate, subject him to all the pains and penalties attached to a wilful breach of trust. The personal credit of the trustee has nothing to do with the security, for the corporate entity is hedged about by the law of its creation with a credit founded upon its own capital, and the landed security is all that would be exacted from a stranger. Although the situation might, like most other innocent circumstances, be used to cloak a fraud, it does not intrinsically differ from the purchase of

the bond of a railway company in which the trustee is a stockholder. If there is fraud, it is in the substance of the transaction rather than in its form. There is nothing in this record tending to show that this corporation was not honestly organized for the transaction of general business under its charter, and without reference to the use of this fund. Taking this view of it we find that the investments were good ones, founded upon the very class of security that the plaintiff prefers, and bearing interest at a rate satisfactory to all. We see no reason why it should be disturbed.

The plaintiff also contends that the trustee should be charged with a reasonable commission upon each of these loans and its renewals. We see no reason why this should be done that does not inhere in every transaction in which the trustee goes directly to the borrower to make a loan without the intervention of a broker. No broker seems to have intervened in this case, although the transaction, like all other transactions involving the trust fund, was entered upon the books of Cornet & Zeibig, where all accounts relating to the fund were kept. The point is a shadowy one and, in our opinion, without merit.

XI. Cornet & Zeibig made certain other real estate loans from this fund for which they received commissions amounting to $298.75. The plaintiff contends that these commissions should be charged to the trustee on the theory that he is bound to account for all profit realized from the trust estate. On the other hand the defendant contends that these commissions were legitimate expenses incurred in the administration of the estate, for which the trustee should have credit. The master found as follows: "Your special commissioner finds that the trustee received one-half of these commissions in the distribution of the profits of the firm of Cornet & Zeibig, and that he is not entitled thereto and should be excluded therefrom, but that he is entitled to credit in his accounting to the other half

Commissions for Making Loans.

thereof which Zeibig received for his services, amounting to $149.38." Both parties have assigned error upon the confirmation of this item in the master's report. While the amount involved might, in comparison with other issues, be characterized as insignificant, yet the question is an important one and deserves careful treatment.

The special master bases his action upon the case of Gamble v. Gibson, 59 Mo. 585, l. c. 593, from which he quotes as follows: "He [an executor] may employ the services of an agent or attorney, if necessary, and pay for them out of the estate, but if he undertakes to act in such capacity himself for the estate he can receive no compensation. The rule is so strict that it has been held that if the trustee has a partner, and employs such partner, no charge can be made by the firm. [Authorities cited.] But if the trustee is excluded from all participation in the compensation, then his partner may be paid for services like any other person." We are unable to concur in the reasoning by which the learned master arrives at his conclusion. Without questioning the statement quoted from Gamble v. Gibson, supra, intimating that if the trustee has a partner he may be employed for compensation to render services included in the duties of the trustee, we merely suggest that the question was not then before the court as it was in Condict v. Flower, 47 Mo. App. 514, in which a different conclusion seems to have been stated. This case must, however, stand upon its own facts. Cornet & Zeibig were loan brokers. These services were performed in the regular course of its business. It does not appear that Zeibig had any personal connection with the transaction, while it did come directly within the duty of Mr. Cornet as trustee. It does not matter what settlement they made as to the division of the amount received from the trust fund in payments of this commission. We have no power to so revise the partnership contract between them that when one-half this fee must be re-

funded one of the partners must be excluded from participation in the remainder.

This view does not, however, reach the real question at issue, which is whether or not under the will which provides only for the payment of actual expenses and reasonable compensation, the trustee is entitled to this or any other sum in addition to the commission of five per cent upon the gross income, which should include these commissions, for making and renewing these particular loans. The value of the services has been fixed by contract as between the trustee and the borrower, but not as between him and his beneficiary, and we see no reason why these particular investments should be made the basis for special compensation to the trustee in addition to the five per cent allowed upon the gross income. It stands upon the same footing, in that respect, as all other loans.

For the reasons stated the judgment of the circuit court is reversed and the cause remanded with directions to proceed to final judgment in accordance with the conclusions stated in this opinion.

*Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.