VINCENT F. TOWNSEND, Appellant, v. MAPLEWOOD INVESTMENT AND LOAN COMPANY, a Corporation.—No. 38460.—173 S. W. (2d) 911.

Division Two, July 6, 1943.

Rehearing Denied, September 7, 1943.

*John E. Corvey* for appellant.

740

*Lashly, Lashly, Miller & Clifford* for respondent.

WESTHUES, C.—Plaintiff, Townsend, filed this a suit in equity to cancel a note of $10,000,00, and also asked for an accounting. The defendant, Maplewood Investment and Loan Company, filed an answer and a counterclaim alleging that the sum of $4,443.87 was still due on said note for which amount judgment was asked. The trial court denied plaintiff's petition and entered judgment against plaintiff and in favor of the defendant on its counterclaim in the sum of $31.85 and costs. Both parties appealed.

The appeal was lodged in the St. Louis Court of Appeals and by it transferred to this court because the amount involved exceeded $7500. Since plaintiff asked that the note be canceled upon which there was a balance due of $4,443.87, and in his accounting asked for judgment against the defendant for sums realized on securities pledged with the note, which sums had been collected by the defendant and credited on the note in excess of $5,000.00, the amount in dispute being in excess of $7500.00 vests this court with appellate jurisdiction.

Plaintiff's contention at the trial was that the defendant company was in need of financial aid and the officers of said company came to him about December 31, 1930, and requested that he loan the company certain deeds of trust and notes of the face value of $9,853.00; that he did this and thereafter was induced to execute a promissory note involved in this suit, in the sum of $10,000.00; that he signed the same in blank, the purpose thereof being unknown to him at the time, but that later the company carried the note and securities on its books as an asset of $10,000.00; that the apparent consideration for said note was a pretended sale by the defendant company to plaintiff of eight hundred shares of its own capital stock.

Plaintiff asked cancellation of the note on the theory that it was given without consideration; that a fraud was practised on him by the officers of the company in that they represented to him the company was in a sound financial condition; that the note was antedated without plaintiff's knowledge and the words "800 shares of common stock" were inserted in said note without his knowledge or consent.

In the body of the note it was recited that the securities above referred to and eight hundred shares of stock of defendant company were pledged by plaintiff as security for the payment of the note. The

defendant by its answer denied the charges made in plaintiff's petition and also affirmatively pleaded laches and estoppel. This latter plea must be sustained. Taking plaintiff's evidence as true, that the officers mislead him as to the financial condition of the company and that the note and records of the company made it appear as though he had bought eight hundred shares of stock when in fact he did not, that the note was actually signed on January 6, 1931, but was dated December 31, 1930, yet plaintiff is in no position to invoke the arm of the court of equity to grant him redress. Plaintiff admitted that he signed the note and also that he delivered the securities to the defendant company. The circumstances of the signing of these papers were related by plaintiff as follows:

"Q. Will you state to the Court the circumstances under which you signed this note? A. Well, on the night of January 6, 1931, I received a phone call from Ralph Townsend about 8:45 in the evening. I was busy at the office, and he asked me if I could not come over to the Loan Company right away. I told him I was very busy at the office; but he said, 'It will only take ten or fifteen minutes,' and wanted to know if I couldn't come right over. . . . I did go over. . . . Well, Dr. Marshall was present, and Merrill Vincent, and Mr. Townsend, Mr. Hardensty, and I believe the auditor, Mr. Muren, was present."

. . .

"Ralph Townsend got up before these directors and made a speech, and asked me if I would loan them ten thousand dollars worth of securities. He had these—he had a number of securities of mine that were being collected at the Citizens Bank in Maplewood. He said he and Merrill Vincent would see that I received the six per cent interest I had been receiving on them over at the bank.

"Q. Now, did you tell him you would let him have them? A. I told him I would let them have them as long as—I told them I would let them have the deeds of trust providing I got my six per cent interest, just the same as I was getting it over at the bank, and also if the Loan Company was in good condition.

"Q. What did they say to that? A. Merrill Vincent said he would help—he would see that we received the six per cent interest; and he assured me the Loan Company was in good condition.

"Q. How did you happen—did you sign a number of papers in blank? A. Merrill Vincent took me over to a table and I signed a good many papers.

"Q. You particularly noticed this one, did you? A. Which one?

"Q. I mean you saw it was in blank, this paper? A. All these papers were in blank that I signed.

"Q. Oh, they were all in blank? How long did this meeting last? A. I wasn't there—I wasn't there at the most fifteen minutes.

"Q. About fifteen minutes? A. I listened to the speech, and Merrill had me to sign these papers, and I was in a hurry to get back to the

office where I had patients waiting when I left, and I was in a hurry to get away, and it looked to me like he was in a hurry to get my signature on these papers and get me out.''

There was evidence introduced from which we could conclude that even if plaintiff did not know the details of the transaction at the time he signed the papers he did learn thereof within a few days thereafter and learned that the company claimed he had purchased eight hundred shares of its stock. However, we need not base our conclusion upon that evidence. Plaintiff testified that he did learn prior to June, 1934, that the books of the company showed he had purchased eight hundred shares of stock and that the stock had been issued in his name; that he had signed the note in question and had pledged the securities and the stock as collateral for the payment of the note. The defendant company from time to time converted the collateral into cash and credited the note with the sums collected. The total of the sums thus credited on the note was $5,585.63. Plaintiff, after learning of that situation in 1934, accepted membership on the board of directors of the company and signed a number of proxies authorizing the parties he later charged had defrauded him to vote the eight hundred shares of stock at the stockholders' meetings. Plaintiff's explanation of his conduct was as follows:

''When you found out you had given this note, and you found out you were a stockholder in the company, did you try to get a receipt from these boys for your securities? A. To get a receipt for the securities? Let's see. Well, after it had gone on that long, and I wasn't doing any good by fussing with them, why I kind of did an about-face. I started in to kind of working with them then and see—because I had heard—Mr. Borth had told me they had good intentions towards taking care of this; that they were going to take this stock off of my hands; and he said, 'You are not doing any good by fighting and fussing with them, and you had better go easy and kind of play along with them.' So I changed about completely, thinking maybe that would help to get back what they had taken from me.''

So plaintiff, as he said in his testimony, played along for more than five years with the parties he claimed defrauded him before he filed suit. In 30 C. J. S. 499, sec. 100, we find a rule of law as old as the courts of chancery. It reads:

''Equity aids the vigilant, not those who slumber on their rights.''
In the text we note the following:

''The maxim expresses the attitude of equity toward laches and stale demands, its design being to promote diligence, punish laches, and discourage the assertion of stale claims, and, as appears sec. 113 infra, it is by force of this principle that equity refuses to enforce demands which the party has unreasonably delayed in asserting.''

Plaintiff not only slumbered on his rights, but by his participation in the affairs of the company after he learned the true facts condoned the alleged wrong perpetrated upon him. The action of the trial

court in dismissing plaintiff's petition can well be sustained on the ground that plaintiff was guilty of laches. We need not therefore discuss other points briefed by the defendant.

Plaintiff's action was in equity. Defendant's counterclaim asked judgment for the balance due on the note. However, by joining issue with plaintiff the entire controversy was triable in equity. This rule is well stated in 30 C. J. S. 506, sec. 104:

"A maxim not often quoted in the [914] opinions is that equity delights to do justice, and that not by halves. The significance of this maxim lies in its last words, and it means that it is the aim of equity to have all interested parties in court and to render a complete decree adjusting all rights and protecting the parties against future litigation. The principle of the maxim embraces the well-established doctrine, discussed supra sec. 67, that when equity once acquires jurisdiction it will retain it so as to afford complete relief."

We now turn our attention to the counterclaim of defendant and determine whether a court of equity should grant the relief sought. We shall see. The company was organized in the year 1926. Its common stock of four thousand shares was subscribed for and taken by the ten incorporators. Later the stock was increased to five thousand shares and the additional shares were also sold or taken up. The company, through its board of directors, made a practise of repurchasing stock which had been sold, paying the stockholders therefor with money belonging to the corporation and marking the stock "retired" or "canceled." At one time the stock thus repurchased with company funds amounted to $19,540.99. That was the situation when plaintiff is alleged to have purchased his stock. About that time the officers of the company discovered that an employee had embezzled funds of the corporation in an amount exceeding $8,000.00. That was the event that gave rise to the officers calling on plaintiff for financial aid and which culminated in his signing the note in question and delivering to the company securities of a face value of over $9,000.00. The company in return issued to plaintiff eight hundred shares of stock which were allegedly a portion of the stock the company had repurchased from stockholders and had marked "canceled" or "retired."

Plaintiff argues that the defendant company had no legal right to purchase with corporate money its own stock and thus decrease its capital. In this plaintiff is correct and is supported by good authority. These transactions of repurchasing its stock were illegal and constituted a fraud upon the other stockholders as well as creditors of the corporation. See St. Louis Carriage Mfg. Co. v. Hilbert, 24 Mo. App. 338; Alexander v. Relfe, 74 Mo. 495, l. c. 519; Wilson v. Torchon Lace & Mercantile Co., 149 S. W. 1156, l. c. 1161 (3); Potts-Turnbull Adv. Co. v. Gatchell, 257 S. W. 134, l. c. 139 (7, 8). In 18 C. J. S. 752, sec. 272 (b), we note the following:

"If the unauthorized reduction takes the form of a surrender, or purchase and retirement, of shares of stock, or a release of subscribers, they will remain liable as subscribers or stockholders to or for the benefit of creditors; and directors or officers who authorize or participate in the reduction will be liable as for a conversion or misapplication of corporate assets."

██ The defendant argues that the stock transferred to plaintiff was treasury stock. This contention cannot be sustained. "Treasury stock is stock belonging to the corporation and subject to sale by it." Maynard v. Doe Run Lead Co., 305 Mo. 356, 265 S. W. 94, l. c. 97 (2). See also 18 C. J. S. 645, sec. 212. The defendant, through its board of directors, could not legally acquire its own stock through purchase with corporate funds and therefore the stock thus illegally acquired could not be designated treasury stock. In fact the records of the corporation did not carry the "retired" or "canceled" stock as treasury stock. The question of the corporation taking a note in payment of its stock was also briefed. Defendant contended that sections 5020 and 5349, Mo. Rev. St. Ann. (1939) do not prohibit the taking of a note for stock, but only prohibit considering the note as payment for the stock. Quoting the first two lines of section 5020 is a sufficient answer to that contention. They read as follows:

"The stock or bonds of a corporation shall be issued only for money paid, labor done or money or property actually received."

██ A promissory note is not money or property within the meaning of that statute. The taking of plaintiff's note of $10,000.00 for eight hundred shares of stock was therefore illegal and unauthorized. We hold, therefore that the defendant corporation has no standing in a court of equity to enforce against plaintiff a contract or note which was the result of illegal trafficking in the stock of the corporation. What we have said herein is not to be construed as affecting the rights of creditors against any of the parties in this suit.

That portion of the judgment of the trial court dismissing plaintiff's petition is hereby affirmed. The judgment of the trial court [915] in favor of the defendant on its counterclaim is hereby reversed, plaintiff to pay the cost he incurred and defendant to pay the cost it incurred. It is so ordered. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.