CAROLINE BADER VEST and MARY BADER OTTS, Plaintiffs-Appellants, v. S. JAMES BIALSON, Trustee, Defendant-Appellant, and TRAVELERS INDEMNITY COMPANY, Defendant-Respondent, No. 44939—293 S. W. (2d) 369.

Division One, July 18, 1956.

Rehearing Overruled in Per Curiam Opinion Filed, September 10, 1956.

1104

*Burton C. Bernard* for plaintiffs-appellants.

*Douglas H. Jones* and *Thomas F. McDonald* for defendant-respond-ent.

1108

[372] HYDE, J.—Action to remove trustee of a testamentary trust, seeking an accounting and to surcharge the trustee with a judgment against him and the surety on his bond. Plaintiffs have appealed from a decree dismissing their suit and making allowances for the trustee's expenses and attorneys' fees.

Defendants raise the question of our jurisdiction, pointing out that the petition asks for no specific amount. It is true, as they state (citing Juden v. Houck, Mo. Sup., 228 S. W. 2d 668) that a recital in briefs as to amount involved is not sufficient to give this Court jurisdiction. However, in this case the petition states the basis of plaintiffs' claim and asks judgment for amounts to be determined on that basis; and the evidence in the record affirmatively shows these amounts total more than $7,500.00. (See Bates v. Clark, 349 Mo. 1087, 163 S. W. 2d 975; Townsend v. Maplewood Inv. & Loan Co., 351 Mo. 738, 173 S. W. 2d 911, 167 S. W. 2d 93; Bates v. Bates, 343 Mo. 1013, 124 S. W. 2d 1117; Aufderheide v. Polar Wave Ice & Fuel Co., 319 Mo. 337, 4 S. W. 2d 776.) The petition asked that the trustee be surcharged with the full amount which he has received as compensation since 1948, which the record shows was $5,780.11 at the time of the trial; and also asked that he be surcharged with the difference between the sale price of an apartment building on Russell Street in St. Louis and the capital invested therein, which plaintiffs' evidence showed was $3,468.13. In addition, plaintiffs asked a surcharge of income loss on the corpus invested in this property which they compute at 3% on the basis of their evidence as $1,677.18; and in an amended petition, which they sought to file, asked [373] a surcharge on an alleged loss of $2,722.50 on another apartment building claimed to have been purchased for more than its real value. Also involved are additional allowances to the trustee for expenses of $1,817.80 and for attorneys' fees of $5,000.00. Thus it affirmatively appears from the record that the amount in dispute exceeds the sum of $7,500.00 (Sec. 3, Art. V, Const.) so that we have jurisdiction.

■ Defendants also filed a motion to dismiss the appeal on the ground of violation of Rule 1.08 in failing to make a fair and concise statement of the facts without argument. We have decided that the interests of justice require a decision on the merits although plaintiffs' statement contains some improper paragraph headings and comments which are argumentative in nature. Properly such matters only should be in the part of the brief provided in the rule for "'an argument''. The motion to dismiss is overruled.

The trust involved was established by the will (executed December 4, 1943) of plaintiffs' mother who died December 12, 1943. It was drafted by defendant Bialson (hereinafter referred to as defendant) who was named therein as executor and trustee. There was a will contest by plaintiffs on the grounds of mental incapacity and defendant's undue influence, but there was no trial on these issues and the validity of the will was upheld. The trust was to continue until plaintiffs (daughters of testatrix) reached the age of 35; Mary was born February 21, 1923 and Caroline January 25, 1926. It was also provided that if either daughter died during the trust period leaving a minor child or children, the trust continued during minority. The trustee was given (by III(a) of the will) the following investment powers: "To hold, possess, manage and control said trust estate and every part thereof, with full power to sell, transfer, convey and dispose of the same upon such terms and in such manner, and for such prices, as to the said Trustee shall seem meet and proper. Said Trustee shall have, and is hereby given and granted, full power and authority to invest and reinvest all or any part of said trust estate in such manner, and in such loans, bonds, stocks, securities or other property, personal or real, and upon such terms and for such lengths of time, as to the said Trustee shall seem meet and proper, and without his being restricted to a class of investments which a Trustee is or may hereafter be permitted by law to make; it being intended hereby to give said Trustee full and complete authority to hold, possess, manage, control, sell, convey, exchange, encumber, pledge, lease, invest, and re-invest the whole and every part of said trust estate according to his sole judgment and discretion, without any limitation upon his power and authority so to do. The trustee may employ counsel and other agents in the discharge of his duties and determine and pay to them a reasonable compensation.''

The duty and discretion of the trustee as to the beneficiaries (by III(b) and (f) of the will) was as follows: "(b) The trustee shall hold the trust estate in trust for the benefit of my two daughters. Mary Bader Otts and Caroline Bader and shall pay over and distribute the entire net income derived therefrom in equal monthly or other convenient installments unto my said daughters Mary Bader Otts and Caroline Bader, each to receive one-half of said amount, share and share alike, until they reach the age of thirty-five (35) years.''

''(f) The said Trustee, at any time during the continuance of the trust, in the exercise of his sole discretion, may encroach upon the principal of the trust estate for the support, maintenance and education, of any of the beneficiaries of the trust. The necessity and propriety of any such encroachment upon principal, and the amount thereof, shall be determined by said Trustee, and his determination shall be final.''

The will (IV) provided: ''The Trustee shall receive as compensation for his services hereunder, fifteen (15%) percent upon the gross income accruing each year to the [374] trust estate and five (5%) percent upon the fair market value of the principal of the trust estate, as and when the same is dispersed or distributed free from trust. In no event the Trustee shall receive less than fifty ($50.00) Dollars per year as his minimum compensation.''

The corpus of the trust estate in 1945 consisted of corporation stocks with a market value of more than $15,000.00; unencumbered real estate on South Broadway valued at $12,250.00 (testatrix had paid that amount for it in 1943) ; real estate on Accomac Street (subject to a $3,750.00 trust deed) valued at $5,000.00 (which was also subject to Caroline's homestead rights until she became of age in 1947) ; and $2,272.47 cash at the end of the year. Defendant sold most of these stocks in 1946 and 1947 ; and they were sold at a profit over the value as of the date of testatrix' death so that a capital gains tax was paid for the trust estate. Defendant invested the money received in two apartment buildings (one on Miami Street and one on Russell Street) so that by the end of 1947 all of the corpus was in real estate. One of the principal charges made against defendant is that by investing all of the corpus in real estate he failed to maintain a prudent diversification of investments and recklessly concentrated the risk of loss of trust assets. It is also contended that defendant acted recklessly, without due care, skill and caution in making these two purchases, that he was guilty of a breach of trust in failing to maintain the trust real estate in proper repair and that he invested in the Russell Street apartment with the improper motive of increasing his commission (computed on gross income) a motive which conflicted with the interest of the beneficiaries. The following facts concerning these investments appear from the record.

*Miami Street Apartments.* Defendant contracted to purchase this building consisting of three apartments on May 3, 1946 for $9,250.00 from Peter Kintzele, a real estate broker who also dealt in real estate on his own account. The deal was closed June 1, 1946. ·Kintzele bought this property for $5,750.00 in February, 1946 and made repairs costing $1,200.00. It also had been sold for $5,750.00 to Kintzele's vendor. It had three apartments, subject to Federal rent controls and a first floor unit not subject to rent control, rented as a tavern. This property was sold in July 1953 for $9,500.00 out of which a sale

commission of $475.00 was paid and with adjustments the net amount realized for the trust was $9,056.33. Thus the corpus loss was about $200.00. Defendant said that before making this purchase he had the property checked by a real estate man, J. P. Texier, who collected rents for him on the Broadway property. He also said plaintiffs were requesting more money and he thought he could increase the income of the estate by investing in real estate. He did raise the rent on the tavern from $35.00 per month to $70.00 and after relaxation of Federal control requirements, in July 1947, obtained 15% rent increases on the apartments. Plaintiffs had expert testimony to the effect that the property was not worth $9,250.00 in 1946 but no value was fixed and it was stated by their witness that $5,750.00 did not reflect its value but that at that price "it was awful cheap" and "a hell of a good bargain." The gross income, expenses and net income on this property was shown by the trustee's reports to be, as follows:

| YEAR | GROSS INCOME | EXPENSES | NET INCOME |
|------|------|------|------|
| 1946 | $ 571.68 (7 mo.) | $311.08 (7 mo.) | $260.60 (7 mo.) |
| 1947 | 1113.50 | 834.46 | 279.04 |
| 1948 | 1340.40 | 498.39 | 842.01 |
| 1949 | 1380.40 | 392.92 | 987.48 |
| 1950 | 1460.40 | 598.77 | 861.63 |
| 1951 | 1467.30 | 491.39 | 975.91 |
| 1952 | 1488.00 | 345.32 | 1142.68 |

[375] These expenses included $120.00 interest annually after 1947, which should have been charged to the Russell Street property because this was interest on $3,000.00 borrowed to pay on the Russell purchase. However, defendant's 15% commission on the gross income is not deducted from the income shown. Nevertheless (considering these factors) it appears that, after 1947, the net income on the $9,250.00 invested was always in excess of 8% (not considering depreciation) and averaged about 10% for 1949 to 1952 inclusive. There was evidence that Miami was built between 1910 and 1912. Some repairs were required in 1947 which was the reason for the low net income that year.

*Russell Street Apartments.* On September 25, 1947, defendant contracted to purchase from Kintzele an apartment on Russell Street (built in 1914) with seven apartments, including one in the basement, and completed the purchase on October 28, 1947. He said he also advised with Texier before making this purchase. At that time, the trust had three unencumbered properties (Accomac, Broadway, and Miami), the trust deed on Accomac having been paid in August. The Russell Street purchase was set up by defendant in his trustee's report as a $29,250.00 deal. However, the Accomac property (two apartments) was traded in at $7.250.00 so that the cash involved was

$22,000.00. This was the price Kintzele had paid for the property earlier in the year so that his profit was whatever the Accomac property was worth, estimated as $4,500.00 by defendant and $5,000.00 by plaintiffs, the price textatrix paid for it in 1943. (Accomac required extensive repairs which Kintzele made before he sold it, estimated by him at $3,500.00 including value of his own labor.) The $22,000.00 was paid by defendant assuming a trust deed of $14,000.00 borrowing $3,000.00 on a trust deed on the Miami property and paying $5,000.00 in cash from estate funds on hand. ($500.00 was paid down and closing check was $4,358.00 due to adjustments.) This investment was increased by $1,701.63 by paying out of corpus in 1949 and 1950 the cost of a new heating plant (and water heater) so that gas could be used and operating expenses reduced. The property was subject to Federal rent control and remained subject to it until it was sold in 1953 for $26,500.00 out of which a real estate commission of $1,000.00 was paid. (Defendant received a check for $11,090.87 for the cash proceeds of the sale, making adjustments for rents, interest, taxes, insurance, etc.) Thus considering the Accomac property worth only $4,500.00, total investment in the property was $14,201.63 (not including the $14,000.00 trust deed) while the net amount received (after payment of the trust deed debt) was $11,500.00 (plaintiffs figuring on the basis of the closing checks, and valuing Accomac at $5,000.00, fixes the investment at $14,559.00 and the net receipts at $11,090.87 making the corpus loss $3,468.13). Certainly, even on the basis of defendant's figures there was a corpus loss of about $2,700.00. Defendant's income figures on this property were as follows:

| YEAR | GROSS INCOME | EXPENSES | NET INCOME |
|------|-------------|----------|------------|
| 1948 | $2974.40 | $3020.09 | $ 45.69 loss |
| 1949 | 3345.60 | 2584.24 | 761.36 |
| 1950 | 3425.60 | 2656.34 | 769.26 |
| 1951 | 3399.70 | 2704.24 | 695.46 |
| 1952 | 3494.50 | 2486.40 | 1008.10 |

The 1948 income loss was due partly to roof repairs and partly because rents were not increased until late in that year. (Plaintiffs say rents could have been increased a year earlier with proper diligence by defendant, since a 15% increase was authorized.) However, to reflect the true situation, these expenses should include an additional [376] $120.00 annually for interest on the $3,000.00 borrowed to purchase the Russell property, which was secured by a trust deed on the Miami property. Defendant's 15% commission on gross income should also be considered to determine the actual income for distribution to the beneficiaries produced by this property. Considering these factors, the income left from the Russell property to be divided between the beneficiaries, was as follows:

| Year | Gross Rentals | Expenses Including Trustee's Commissions and $120 interest on $3,000 loan | Remaining net income for distribution to Beneficiaries | Yield on Investment |
|------|------|------|------|------|
| 1948 | $2,974.40 | $3,586.19 | $611.79 loss | (none) |
| 1949 | 3,345.60 | 3,206.08 | 139.52 | 1.08% |
| 1950 | 3,425.60 | 3,289.74 | 135.86 | .9 % |
| 1951 | 3,399.70 | 3,334.20 | 65.50 | .5 % |
| 1952 | 3,494.50 | 3,130.23 | 364.27 | 2.5 % |

Total Net Income Available for
Distribution to Beneficiaries
'48-'52 ...........................$93.36 (705.15—611.79)

Plaintiffs' calculation shows that at 3% the corpus invested in the Russell property (figured at $12,858.00, 1948-1949 and at $14,559.00, 1950-1952 after replacing the heating plant), deducting trustee's commissions on the amount that 3% would have produced, the total amount of $1,770.54 (for these five years) would have been available for distribution to them. ($327.88 annually, 1948-1949 and $371.26 annually, 1950-1952.) This is the basis of plaintiffs' claim for a surcharge of $1,677.18 for income loss caused by investing in the Russell property ($1,770.54—$93.36 actually available.) Plaintiffs also calculate from the trustee's reports that the amount and proportion of the trustee's commissions on gross income from the Russel property and the other properties was as follows:

| Year | Trustee's Total Income Commissions | Commissions from Russell Property | Commissions from Broadway and Miami Properties | Russell Commissions % of Total Commissions |
|------|------|------|------|------|
| 1948 | $1,032.27 | $ 446.16 | $ 586.11 | 43% |
| 1949 | 1,117.68 | 501.84 | 615.84 | 45% |
| 1950 | 1,202.30 | 513.84 | 688.46 | 43% |
| 1951 | 1,186.15 | 509.95 | 676.20 | 43% |
| 1952 | 1,209.35 | 519.17 | 690.18 | 42% |
| | $5,747.75 | $2490.96 | $3256.79 | 43% |

*Broadway Property and Other Matters Concerning Real Estate.* The Broadway property (built before 1875) was the best net income producer of the three properties (netting more than the combined net of the other two 1948-1952 inclusive) and was sold at a profit of

$2,750.00 over the price testatrix had paid for it in 1943, which also was the inventory price. Broadway consisted of two buildings with three commercial units and 15 three room flats. All rentals on all properties were collected for defendant by real estate agents who got 5% of the collections for their services, which [377] included management services. (This charge was reduced to 3% in 1952 on Miami and Russell.) Plaintiffs complain that defendant failed to make necessary repairs on any of the buildings and permitted them to deteriorate in value. They had considerable evidence concerning their condition, including photographs, records of the City Building Inspector and the Police Court concerning inspection, notices to repair and complaints, records of complaints to the real estate company collecting the rents as defendant's agent, and testimony of tenants and plaintiffs and their real estate expert. Defendant said he maintained them on as minimum a basis as he could to produce the maximum income. As the trial judge commented, this was a common condition under rent control and there is no evidence to show repairs would have increased the value of the buildings by the amount of their cost. Defendant took the position that it was plaintiffs' duty to maintain Accomac during the homestead period and it got into such condition that it was necessary either to dispose of it or spend at least $2,000.00 for repairs. Defendant says that he sold the corporate stocks and invested the corpus in real estate for the purpose of increasing the income of the estate because of plaintiffs' claim that they needed more money. He says that by investing in real estate he did increase the net income available for distribution to them and shows that the net income and rate of return on $31,000.00 assets, after deduction of trustee's commissions on gross income, was as follows:

Periods in which assets were not invested 100% in Real Estate for full yearly periods.

| 12-14-43 to 12-31-45—2 years—2343.24 | net income | |
| 1- 1-46 to 12-31-46—1 year —1649.43 | ,, ,, | —5.32% |
| 1- 1-47 to 12-31-47—1 year — 557.87 | ,, ,, | —1.80% |

Total —4 years—4550.54 = 1137.65 average income per year.

Periods in which assets were invested 100% in Real Estate for full yearly periods.

| 1-1-48 to 12-31-48—1 year—1659.78 | net income—5.35% | |
| 1-1-49 to 12-31-49—1 year—1903.01 | ,, ,, | —6.13% |
| 1-1-50 to 12-31-50—1 year—2603.34 | ,, ,, | —8.39% |
| 1-1-51 to 12-31-51—1 year—2369.03 | ,, ,, | —7.64% |
| 1-1-52 to 12-31-52—1 year—2766.51 | ,, ,, | —8.92% |

Total —5 years 11301.67 = 2260.33 average income per year.

However, as hereinabove shown, the Russell property added very little to this return. Furthermore, the low income of 1947 was partly due to the fact that expenses at both Miami and Broadway were higher that year than in any other year of the trust. (Due to more than $1200.00 repairs on Broadway and over $350.00 on Miami.) Moreover, no income from Accomac then went into the trust estate because of the homestead rights. Plaintiffs lived upstairs in Accomac at the time it was traded for Russell. They were both married at the time and they moved into one of the third floor apartments in Russell for which they paid defendant $35.00 per month. This was not increased when rent controls were relaxed and later plaintiffs sublet this apartment for $65.00 per month and retained the difference. Plaintiffs had paid no rent at Accomac, because of Caroline's homestead rights there until shortly before Russell was purchased, and also retained the rent on the first floor apartment under such rights but did pay the interest on the trust deed debt during that period; Mary was Caroline's guardian during that period.

[378] *Distributions to Beneficiaries and Trustee's Commissions.* The amount and payment of trustee's commissions and the distribution to beneficiaries from income and corpus was as follows:

| One year periods ending as shown | Trustee Commission Earned | Trustee Commission Payments. | Paid to Beneficiaries from Income | Paid to Beneficiaries from Corpus | Total Payments to Beneficiaries |
|---|---|---|---|---|---|
| 12-31-45 | 864.80 | 700.00 | 2343.24 | 859.44 | 3202.68 |
| 12-31-46 | 573.66 | 164.80 | 1649.43 | 150.57 | 1800.00 |
| 12-31-47 | 768.77 | 973.66 | 557.87 | 1282.13 | 1840.00 |
| 12-31-48 | 1063.28 | 368.77 | 1659.78 | 620.22 | 2280.00 |
| 12-31-49 | 1119.03 | 363.28 | 1903.01 | 26.99 | 1930.00 |
| 12-31-50 | 1202.30 | 963.28 | 1680.00 | ....... | 1680.00 |
| 12-31-51 | 1186.15 | 2058.05 | 1680.00 | ....... | 1680.00 |
| 12-31-52 | 1209.35 | 1186.15 | 1840.00 | ....... | 1840.00 |
| 1953 | | 1209.35 | | | |
| | 7987.34 | 7987.34 | 13313.33 | 2939.35 | 16252.68 |

Defendant retained 5% commission on these payments from corpus. It will be noted that the full amount of net income for 1950, 1951 and 1952 was not distributed to the beneficiaries. The undistributed excess for each year was 1950—$923.34, 1951—$689.03, 1952—$926.51, a total of $2,538.88. These amounts were shown on the trustee's reports for each of these years as transferred to corpus. Defendant did this on the theory that he could replace from current income the distributions to beneficiaries from corpus made in prior years. Plaintiffs contend this was in violation of paragraph III(b) of the will and ask that the trustee be surcharged for interest on these undistributed amounts at 6% which they calculate would total $428.18. This,

total amount of $2,538.88 of net income withheld was ordered by the trial court on March 16, 1955 to be distributed to plaintiffs. This was the date on which plaintiffs' motion for new trial was overruled and the interest claimed by plaintiffs as the basis for this surcharge is figured to that date.

As a result of the sales of the three parcels of real estate (all made in 1953 after this suit was commenced) defendant received more than $32,000.00. At the time of the trial, the corpus of the trust consisted of $30,000.00 face value U. S. 2 5/8% Certificates of Indebtedness and $2,746.65 in cash. At the end of each year, defendant made and sent to plaintiffs detailed reports showing all his annual receipts and disbursements. The accuracy of these reports is not questioned and they are the basis for all figures and calculations supra. (Included in the corpus figures, at the time of the trial, was the undistributed income of $2,538.88 withheld on the theory that previous corpus distributions could be replaced from subsequent income.) Other facts will be stated in connection with rulings hereinafter made.

The trial court's decree makes the following findings: "1. That the evidence adduced herein does not show any reckless or improperly motivated acts or conduct on the part of the Trustee herein. 2. That such Trustee was not guilty of any incompetency requiring his removal. That the beneficiaries accepted the benefits of the investments made by the Trustee over a long period of time and beneficiaries consulted with and had the benefit of counsel practically all during the period of the administration of the trust by the Trustee. 4. That the Trustee was given broad powers under the trust instrument and that said Trustee did not violate his duties or any of the terms of said trust instrument. 5. That the Estate sustained no loss, and the beneficiaries [379] have been paid a substantial income. 6. That the Trustee should not be ordered removed, and further finds that the evidence fails to show that he should be surcharged with any amounts."

In this kind of case, while it is our duty to pass on the weight of the evidence and make our own findings, we accord due deference to the Chancellor's determination of factual questions which it is necessary to determine from conflicting oral evidence of witnesses who appeared before him. (Shelton v. McHaney, 343 Mo. 119, 119 S. W. 2d 951 and cases cited; Sec. 510.310 RSMo. V.A.M.S.) Therefore, we will accept the court's finding of fact that there was no reckless or improperly motivated acts or conduct by defendant, in the sense of no dishonest motive or intentional violation or grossly negligent disregard of duties. Some of the other findings are not findings of fact but instead are conclusions of law. However, there is one finding of fact that we cannot accept on the basis of the whole record, namely, the finding that the estate sustained no loss, because the evidence conclusively shows there was a loss on the Russell transaction.

■ While it is true that the total value of the corpus was substantially the same at the time of the trial as it was in 1945 when the administration of the trust began, this is true mainly because the profit (over inventory value) on Broadway was equal to the loss on Russell. (There was also some gain in the market value of the stocks sold.) "The trustee who has incurred liability by reason of a breach of a duty regarding investments cannot reduce his liability by proving that he has made a profit for the trust by other legal or illegal conduct in the trust administration." (Bogert, Trusts and Trustees, Sec. 702; see also Restatement of Trusts, Sec. 213, comments a and b; Scott on Trusts, Sec. 213.1; Creed v. McAleer, 275 Mass. 353, 175 N. E. 761; State ex rel. Bottcher v. Bartling, 149 Neb. 491, 31 N. W. 2d 422; King v. Talbot, 40 N. Y. 76; Schuster v. North American Mortgage Loan Co., (Ohio), 65 N. E. 2d 667; Cuyler's Estate, 5 Pa. D & C 317; Murphy-Bolanz Land & Loan Co. v. McKibben, (Tex.), 236 S. W. 78; Annotation, 171 A.L.R. 1422.) Russell was certainly an unfortunate investment from the standpoint of producing any substantial net income for the beneficiaries as well as from the corpus loss sustained. The trial judge in a memorandum filed with the decree said: "The investment in the Russell Street property at the time it was made does not appear to have been too well considered"; but he thought there was no loss because of the price placed on Accomac in the deal. However, the price of Russell was inflated by the same amount as the inflation in the Accomac price so that there was no gain to the estate from that. (See analysis of the cash transaction, supra.) Thus we must find that there was a corpus loss of $2,700.00 on the Russell transaction and also that Russell never produced any substantial net income (after expenses and trustee's fees) available for distribution to plaintiffs prior to the commencement of this action. (Less than $100.00 total 1948-1952 inclusive.)

■ However, these facts alone do not show breach of trust, because a trustee is not an insurer nor required to be infallible in his judgment. (Boland v. Mercantile-Commerce Bank & Trust Co., 349 Mo. 731, 163 S. W. 2d 597; Fairleigh v. Fidelity National Bank & Trust Co., 335 Mo. 360, 73 S. W. 2d 248; Restatement of Trusts, Sec. 204; Scott on Trusts, Sec. 204.) As stated in the Boland case (163 S. W. 2d, l. c. 602); "In making investments of trust funds the trustees must consider first the question of the safety of the investment (Cornet v. Cornet, 269 Mo. 298, 316, 318, 190 S. W. 333) and second the matter of diversification of such investments to distribute the risk of loss. (Restatement of Law of Trusts, Sec. 228.)" In the Boland case as in Rand v. McKittrick, 346 Mo. 466, 142 S. W. 2d 29, we approved as the rule in this State Sec. 227, Restatement [389] of Trusts, as follows: "In making investments of trust funds the trustee is under a duty to the beneficiary (a) in the absence of provisions in the terms of the trust or of a statute otherwise providing, to make

such investments and only such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived.'' (For matters to be considered in selecting investments in addition to safety and amount and regularity of income see comment m under Sec. 227, Restatement of Trusts; Scott on Trusts, Sec. 227.12.) By the terms of the trust, defendant had wide investment powers and was unrestricted as to class of investments, with investment in real estate being expressly authorized; and authority to encumber trust real estate was also expressly authorized. The validity of these trust provisions was established in the will contest and cannot now be questioned.

Nevertheless, although defendant was given the widest discretion in making and managing investments, that does not mean he is beyond all control and accountability. ''A court of equity will never favor a construction that confers on the trustee absolute and uncontrollable powers.'' (Garesche v. Levering Inv. Co., 146 Mo. 436, 447, 48 S. W. 653; See also Plummer v. Brown, 315 Mo. 627, 659, 287 S. W. 316, 327 and Restatement of Trusts, Sec. 187 and Sec. 227.) Sec. 187 says: ''Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.'' (For remedies for abuse of discretion, see Scott on Trusts, Sec. 187.1; See also Lyter v. Vestal, 355 Mo. 457, 196 S. W. 2d 769; Koplar v. Rosset, 355 Mo. 496, 196 S. W. 2d 800; Bogert, Trusts and Trustees, Sec. 560.) As stated in comment i under Sec. 187, ''Although discretion is conferred upon the trustee as to the choice of investments, he cannot properly invest in hazardous securities.'' Likewise as said in comment v, Sec. 227, ''An authorization by the terms of the trust to invest in a particular type of security does not mean that any investment in securities of that type is proper. The trustee must use care and skill and caution in making the selection. * * * Where by the terms of the trust discretion is conferred upon the trustee to make certain investments, he is subject to liability if he abuses the discretion (see Sec. 187). Thus, if the trustee is permitted to invest in a particular security or type of security in his discretion and the circumstances are such that it would be beyond the bounds of a reasonable judgment to make the investment, the trustee is subject to liability if he makes it.'' Furthermore, a trustee is in a fiduciary relation to the beneficiary and ''is under the duty to the beneficiary to administer the trust *solely* in the interest of the beneficiary.'' (Emphasis ours.) (Restatement of Trusts, Sec. 170.) This is the primary duty of any trustee and must be the principal guide to be considered in the construction of any powers given him by the trust instrument and the propriety of his acts under them. ''He is not permitted to place him-

self in a position where it would be for his own benefit to violate his duty to the beneficiaries." (Scott on Trusts, Sec. 170.)

 While we construe the trust provisions as giving defendant sole and complete discretion as to class of investments, nevertheless, this did not authorize speculative or hazardous investments in any class or dispense with all requirements of care, skill, caution and reasonable diversification of risk. Certainly such requirements are not specifically excluded. Although real estate was an authorized investment under the provisions of this trust and the trust owned Broadway and Accomac when it began, nevertheless, the fact that real estate was an authorized investment did not necessarily make it prudent to have the entire corpus invested in real estate. (See Bogert, Trusts and [381] Trustees, Sec. 678.) When the trust began, about half of the corpus value was in corporate stocks, which provided some diversification of investments. The sale of these stocks at a profit, the payment of the mortgage on Accomac and the purchase of Miami, under the evidence, cannot be held to be an abuse of discretion in view of the trial court's findings and our own view of the evidence. However, the purchase of Russell put all the trust corpus in real estate and Russell had no commercial units, free from rent control, as did the other two. Moreover, on the basis of probable operating expenses, which the evidence shows could have been estimated, it was apparent that it would produce very little net income available for distribution to the beneficiaries as long as it was subject to the existing rent controls. Thus it was essentially a speculative investment, both as to probable net income and future value, dependent upon early termination of rent controls which the evidence shows was anticipated by defendant. To purchase this property, subject to a $14,000.00 mortgage, and to encumber Miami for $3,000.00 to obtain part of the purchase price, incurred an indebtedness of $17,000.00 against the trust estate with annual interest charges of $680.00. (This was ⅕ of the gross Russell rentals; another ⅕ went for commissions; trustee's commissions, 15%, and rent collection agent's commissions, 5%.) It is true that Accomac, in which Caroline's homestead had just expired, required extensive repairs if it was to be kept; but Russell also required repairs which reduced net income and increased the corpus investment. (After repairs Accomac was sold for $8,000.00 by Kintzele.) We must, of course, consider this transaction upon the basis of the circumstances existing at the time it was made and not upon subsequent events. (Restatement of Trusts, Sec. 227, comment m, p. 652; Scott on Trusts, Sec. 227.12, p. 1224; 54 Am. Jur. 296, Sec. 377; 90 C.J.S. 575, Sec. 335.) Nevertheless, so viewing it, we must agree with the trial court's view that this transaction "at the time it was made does not appear to have been too well considered." It does not appear as a prudent investment either from the standpoint of producing income available for distribution to the beneficiaries or

of safety of corpus invested (incurring a $17,000.00 debt on a $26,-500.00 purchase, see Scott on Trusts, Sec. 191) as well as resulting in lack of diversification in class of investments.

Furthermore, there is another important factor to be considered, namely, that under the circumstances the trustee permitted himself to be placed in a position in which there was a conflict of interest between himself and the beneficiaries. This was due to the fact that he would receive 15% of substantial gross income regardless of whether this investment produced any net income available for the beneficiaries. Thus a substantial return to him was certain while income for the beneficiaries was highly speculative. (The result was that from 1948 to 1952 inclusive defendant received $2,490.96 commission on Russell gross income, while the total net available for distribution to beneficiaries was $93.36.) Therefore, the risk of loss of income was placed almost entirely on the beneficiaries. While we do not mean to hold that this was defendant's motive or purpose in making this investment, we do hold that it was a failure to comply with his duty to administer the trust *solely* in the interest of the beneficiaries and amounted to an abuse of discretion in making this investment, when considered in connection with all of the other circumstances hereinabove discussed. No doubt, he had great hope for considerable increase both in income and in value from early termination of rent controls but that indicates the speculative character of the transaction. Our conclusion, under all these circumstances, is that defendant should be subject to liability for the corpus loss on this investment and we hold that he should be surcharged in the sum of $2,700.00. This surcharge is not much more than defendant received in commissions on the gross Russell income [382] and the result will be that he will not gain anything from the Russell transaction; and as hereinabove shown plaintiffs did not gain anything substantial from it.

We must further hold that defendant failed to comply with the terms of the trust (III(b) of the will) providing that the trustee ''shall pay over and distribute the entire net income derived therefrom (the trust estate) in equal monthly or other convenient installments unto my said daughers'' (naming plaintiffs). This is mandatory (McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S. W. 410) and defendant's retention of part of the net income for the years 1950, 1951 and 1952 was unauthorized, although done on the theory that he could replace previous corpus distributions from subsequent income. (See Restatement of Trusts, Sec. 182; Scott on Trusts, Sec. 182.) Defendant points to no provision of the will authorizing such replacement and we hold there is none. This was recognized by the trial court and, as noted, defendant was ordered to pay this withheld income to plaintiffs and has done so. Plaintiffs contend defendant should be surcharged with interest for the period

this income was withheld but since this question does not appear to have been previously decided, we will not hold defendant accountable for interest. However, defendant should not have been allowed a 5% commission on this distribution of income (which the court ordered credited on the allowance made to him for preparation for trial, hereinafter discussed) because it was not corpus and did not become corpus by being improperly retained to replace corpus distributions.

Plaintiffs urge that, regardless of whether or not there are other grounds, the long standing ill-will and hostility between the trustee and the beneficiaries requires his removal. The trial court's memorandum states: ''There is no doubt that a strong personal antagonism has developed between the beneficiaries and the trustee but fortunately the trustee has assured that he will resign after he has proven that he has not defrauded the beneficiaries and after his handling of the estate has been proven to be such that he is not guilty of the charges laid against him.'' The trial court thus recognized that it would be in the best interest of the trust estate to have a new trustee and in its final decree provided that the additional allowance which the court made for defendant was to be paid to him ''upon resignation and turning over the assets of the estate to his successor trustee.''

Hostility between a trustee and beneficiaries generally does not in itself constitute a ground for the removal or discharge of the trustee; but it is a factor to be taken into consideration; especially where the exercise of discretion by the trustee requires personal relationship between the trustee and the beneficiary, and under some circumstances may require removal of the trustee even though he has been without fault in the administration of the trust. (54 Am. Jur. 112, Sec. 132; 90 C.J.S. 191, Sec. 232; Annotation 45 A.L.R. 331; Restatement of Trusts, Sec. 107; Scott on Trusts, Sec. 107; Shelton v. McHaney, 343 Mo. 119, 119 S. W. 2d 951; Selleck v. Hawley, 331 Mo. 1038, 56 S. W. 2d 387; Gartside v. Gartside, 113 Mo. 348, 20 S. W. 669; Gaston v. Hayden, 98 Mo. App. 683, 73 S. W. 938.) In this case, hostility started at the beginning of the trust, when plaintiffs contested the will on the ground of defendant's undue influence. It continued during the period when Caroline had a homestead at Accomac and Mary was her guardian. They were represented then by a different lawyer than the one who brought the will contest and there was controversy about maintenance and repairs at Accomac, about their need for money, and other matters. Their attorney tried to work things out with defendant during that period; and during that period most of the advances from corpus were made. Plaintiffs were both married while living at Accomac and each had a daughter. Each was separated from her husband at the [383] time of the trial and they were working to support themselves and small children. When they moved from Accomac (where they had seven rooms) to Russell, plaintiffs and their husbands lived together in one five room apartment on the third floor.

There was controversy about the condition of this apartment and about getting on a lower floor; also about heat, repairs, hospital bills when the children were born, and other matters; and remarks were made by plaintiffs to defendant and by defendant to plaintiffs that were very much resented. Certainly we cannot say that defendant was without fault in the creation of this situation of hostility, which was not improved by his action in withholding part of the income of the years 1950, 1951 and 1952 when the trust provisions required him to distribute it to plaintiff. It seems clear from the record that there is such resentment and hostility between the parties as to prevent the trust purposes from being carried out by defendant in the manner obviously intended. Considering all these matters together with the Russell transaction and the conflict of interests permitted to be created thereby, our conclusion is that the removal of the trustee is required.

We further hold that, under these circumstances, the court should not have made allowances to defendant of $1,650.00 for additional fees for preparation of his defense, $167.80 for expenses and $5,000.00 for attorney's fees or for any additional amount for such purposes. (See Re Drake, Minn., 263 N. W. 439, 101 A.L.R. 801 and annotation 806; 54 Am. Jur. 408, Sec. 513.) The trust provision for defendant's compensation was most generous. (See Bogert, Trusts and Trustees, Sec's. 974, 975.) As hereinabove shown, defendant had received up to the time of the trial $7,987.34 in commissions while plaintiffs together had received only $13,313.33 from income; and even with the $2,538.88 withheld income, later ordered paid to them, they received only $15,852.21 or $7,926.10 each. Thus, defendant received as much from the estate in commissions as each of the plaintiffs received from income. Certainly under the circumstances and result reached herein, we do not think he is entitled to any more from this rather modest sized estate for the period up to and including the trial. Defendant filed a motion for new trial and notice of appeal from the order allowing fees, on the ground that the allowances made were inadequate, but has not perfected this appeal and it is now dismissed.

It is said: "Allowance of compensation to a trustee who has committed a breach of trust, upon a finding that the trustee was not incompetent or chargeable with actual bad faith or fraud, is largely a matter of judicial discretion and will not ordinarily be disturbed on appeal. In the case of minor faults of a trustee, resulting only in partial losses of trust funds for which his account has been surcharged, a court, in its discretion, may diminish the amount of the trustee's compensation." (54 Am. Jur. 424, Sec. 539; see also Annotation 110 A.L.R. 566, 577, citing Garesche v. Levering Inv. Co., 146 Mo. 436, 48 S. W. 653 and Cornet v. Cornet, 269 Mo. 298, 190 S. W. 333.) Sec. 243 Restatement of Trusts, states: "If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation."

(For matters to be considered see comment c under Sec. 243 and Scott on Trusts, Sec. 243.) It is there said by Scott: "The trustee is liable for any loss resulting from his breach of trust; and even if the court allows him compensation, his liability for breach of trust can be set off against his claim for compensation or his compensation withheld until he has made good the loss." Since we accept the finding of the trial court that there was no fraud, dishonesty, bad faith or reckless conduct on the part of defendant, we overrule the contention that he should be allowed no compensation and surcharged with the amount he has received. [384] We, therefore, hold that defendant may retain what he has received and set off against the $2,700.00 surcharge, for the Russell loss, the 15% commissions which he would be entitled to receive on income collected during and after 1953 and the 5% commission on the corpus to which he would be entitled on final settlement; provided, however, that he shall account for the 5% collected on the withheld income for the years 1950, 1951 and 1952, distributed to plaintiffs in 1955, to which commission we hold he is not entitled.

The decree and judgment is reversed and remanded with directions to enter decree and judgment in accordance with the views herein expressed. All concur.

## On Motion for Rehearing

■ PER CURIAM.—Defendant says he accounted for the 5% commission on the corpus distributions to the beneficiaries in his 1953 report. (Made after the trial herein.) Of course, if he has done so the trial court may take that into consideration in its final decree.

■ Other matters raised in the motion reargue rulings made in our opinion and we adhere to these rulings for the reasons stated therein. However, we note one argument made by defendant as follows: "The annual interest charge of $120.00 on the $3,000.00 deed of trust put on the Miami property to get funds to buy the Russell property cannot be considered (as the Court erroneously did) as a charge on the Russell property income and at the same time the principal amount of $3000.00 be considered as money invested in the Russell Avenue equity. If the loan is to be treated as a purchase money mortgage for the Russell property with the interest charged against Russell property income, the corpus invested in Russell is only $9500.00. The assets of the trust invested in the Russell property, were the Accomac property, valued at $4,500.00, and cash in the sum of $5,000.00. The Court simultaneously charged $120.00 interest against Russell income and computed the yield from the investment on the basis of $12,500.00 investment."

The only bearing this matter has is in fixing the amount of the investment in Russell for the purpose of figuring the annual percent of yield produced by it. Actually our mistake was that, in computing this yield, we failed to consider the $14,000.00 mortgage on Russell in

determining the total investment therein. (Plaintiffs' attorney had likewise failed to consider it in figuring the yield.) Actually the total investment in Russell was $26,500.00 ($17,000.00 borrowed funds—$9,500.00 estate funds); and, to give the true figure, the yield should be figured on $26,500.00 because the trust estate was obligated for the $17,000.00 debt and had to earn and pay the interest on it. The fallacy of defendant's argument is shown by the fact that, under his method of computation, any yield would be 100% if he had borrowed the entire $26,500.00 to buy Russell.

 It should also be said that it is not true as suggested that there would be a conflict of interest between trustee and beneficiary in every case in which the trustee's compensation was fixed as a percentage of gross income. The determination of a real conflict would depend on the percentage involved, the proportion of the net income to gross income, and the way in which the estate was managed with reference to increasing gross income disproportionally to net income.

The motion for rehearing is overruled.