**E. L. CAPOFERRI, Plaintiff-Respondent,**

**v.**

**Robert E. DAY, Defendant-Appellant.**

**No. 9285.**

Missouri Court of Appeals, Springfield District.

May 12, 1975.

---

Neale, Newman, Bradshaw & Freeman, O. J. Taylor, Springfield, for defendant-appellant.

John A. Honssinger, Lebanon, for plaintiff-respondent.

STONE, Judge.

In this court-tried action instituted on October 2, 1965, by plaintiff Dr. E. L. Capoferri against defendant Dr. Robert E. Day to recover an alleged "overpayment of [income] taxes and interest," defendant Dr. Day appeals from the judgment against him in the principal sum of $6,319.04 with interest thereon from and after April 22, 1964. For an understanding of our disposition of this appeal, a careful factual review is necessary.

During 1957 Dr. Day, then engaged in the practice of "general dentistry" in the Kansas City area, was taking a graduate course in orthodontics with a view to changing his practice to that specialty. Having drastically curtailed his general practice while taking the graduate course, after completion thereof in December 1957 his time was not fully occupied in his own office so he arranged to treat orthodontic patients in the offices of certain dentists in other cities. One of the dentists with whom he became acquainted and, during the latter part of 1957, effected such an arrangement was Dr. Capoferri who was engaged in general practice at Lebanon, Missouri. Under that arrangement, Dr. Day came to Lebanon at appointed times and treated orthodontic patients in office space "shared" with Dr. Capoferri. The two dentists were not partners and each billed his own patients, but "ten per cent of the gross amount taken" by Dr. Day for treatment of patients at Lebanon was paid to Dr. Capoferri as "rental."

Early in 1959 Drs. Capoferri and Day (hereinafter sometimes referred to as "the dentists") talked with one Mulhern of Kansas City, an architect who kindled and fanned the dentists' interest in "corporate entities where self-employees could legally gain the pretax advantage towards (sic) long range retirement and capital gains

through a corporate entity." After they had "talked this thing over a number of times," the dentists decided to confer with Mr. Anthony J. Miceli, a Kansas City attorney who had been recommended by Mulhern. Miceli's testimonial recollection was that, during his first conference with the dentists in "early 1959," they "wanted to incorporate their personal practice and all of their property and everything into one corporation" but that he told them "their personal practice would have to be eliminated" and suggested they "think it over and see if they wanted that." Dr. Capoferri remembered Miceli had informed the dentists that "in the beginning . . . I would gain a little advantage taxwise, more so than Dr. Day because I had more assets go in it," but had declared that formation of the corporation was "like a marriage" and "in time we would equalize, depending upon how fast Dr. Day wanted to build up the equities in this corporation." However, Miceli said he was not "a tax consultant man" and, upon his recommendation, the dentists conferred with Meyer Rashbaum, a Kansas City CPA.

Subsequently during the spring of 1959, under Miceli's legal guidance the dentists did "incorporate their physical assets" in a Missouri corporation, C and D Dental Associates, Inc. (hereinafter "the corporation"). Dr. Capoferri identified the property transferred by him to the corporation as "my office building and equipment, what automobiles I may have had then, and physical plants in relation to my practice—any assets that I had at that time." In similarly indefinite fashion, the property transferred by Dr. Day to the corporation was described as "his equity in a farm at Higginsville and his equipment that he had in these various offices at that particular time, and the automobile and plane and what farm equipment he had." Although there is no disclosure in the record concerning the valuation of any property or equity therein transferred to the corporation, we are informed that the aggregate valuation of the proper-

ties or equities therein transferred by Dr. Capoferri to the corporation was "39,000 or $39,500, somewhere around there," in excess of the aggregate valuation of the properties or equities therein transferred by Dr. Day to the corporation and that, to equalize the dentists' capital contributions to the corporation and their "voting privileges" therein, Dr. Day executed and delivered to the corporation his note for the difference in the aggregate valuations of the properties transferred by the respective dentists. Whereupon, 560 shares of the capital stock of the corporation were issued to each dentist and 2 shares of such stock were issued to Mulhern.

■ We observe parenthetically that, although we do not attribute to the dentists, or either of them, any improper or illegal motive or intent, the record before us indicates that such portion of Dr. Day's 560 shares of corporate capital stock as he received for his note of "$39,000 or $39,500, somewhere around there," was issued in direct contravention of the plain constitutional provision that "[n]o corporation shall issue stock . . . except for money paid, labor done or property actually received" [Mo.Const. Art. XI, § 7, V.A.M.S.] and the equally positive statutory prohibition that "[n]o note or obligation given by any shareholder . . . shall be considered as payment of any part of any share or shares . . . ." § 351.165, RSMo 1969, V.A.M.S. See Townsend v. Maplewood Investment & Loan Co., 351 Mo. 738, 745, 173 S.W.2d 911, 914(8) (1943); Bankers' Mortgage Co. v. Lessley, 225 Mo.App. 643, 38 S.W.2d 485, 486(1) (1931).

Returning to the evidentiary jungle, we find that, insofar as they are revealed, the corporate operating practices and procedures were, to put it mildly, unconventional and unorthodox. Such information as we have in this area is gleaned from the dentists' testimony, since no corporate minutes, books or records of any character were offered in evidence. The dentists agreed

that, although two *corporate* bank accounts, to wit, one in a Lebanon bank and another in a Kansas City bank, were established and maintained, only Dr. Capoferri could draw on the Lebanon account and only Dr. Day could draw on the Kansas City account; that Dr. Capoferri from time to time deposited in the Lebanon corporate account "rent" on the Lebanon properties, both real and personal, title to which he had transferred to the corporation, and paid from the same account all expenses related to those properties; and that similarly Dr. Day from time to time deposited in the Kansas City corporate account all income from properties, including his farm, title to which he had transferred to the corporation, and paid from the same account all expenses related to those properties. Neither dentist sought or acquired any information concerning deposits in or withdrawals from the corporate account controlled by the other dentist. Dr. Capoferri said that Rashbaum had advised maintenance of the two corporate bank accounts—"that was a part of his accounting methods."

Shortly after the close of each calendar year, Dr. Capoferri delivered to Rashbaum in Kansas City the relevant records pertaining to corporate operations in Lebanon during the preceding year and also his personal records for that year, and Dr. Day likewise delivered to Rashbaum the relevant records pertaining to corporate operations in the Kansas City area and also his personal records, in order that Rashbaum might prepare income tax returns for the corporation and each of the dentists. Having (as Dr. Capoferri explained upon trial) "left up to" Rashbaum "[a]ll the paying of income taxes and the accounting and so on," neither of

the dentists knew that Rashbaum had not filed *corporate* tax returns until that neglect was discovered in the course of what began as "a routine spot check" in Dr. Capoferri's office by an Internal Revenue Service agent.[1] Rashbaum then declared that he had filed corporate tax returns but, when an IRS search revealed none, he admitted that none had been filed.

As a result of the ensuing IRS investigation, additional income taxes, penalties and interest were assessed against the corporation and each of the dentists. Notwithstanding Rashbaum's prior negligence or carelessness, the dentists still relied on him to obtain the "final figures" from the IRS and pressed him (as Dr. Capoferri put it) "to get this resolved." During the latter part of April 1964,[2] the dentists met with Rashbaum in Kansas City, at which time he informed them that the additional income taxes, penalties and interest assessed against the corporation and the individual dentists aggregated $19,874.56. Dr. Day said Rashbaum also broke down that aggregate by giving them three figures and thus informing them of the amount assessed against each of the three taxpayers, i. e., the corporation and the individual dentists. On the other hand, Dr. Capoferri insisted that at the April 1964 meeting Rashbaum had given the dentists only the aggregate figure owed by the three taxpayers. In this connection, we observe parenthetically that the IRS agent's report (deft's. ex. B) theretofore transmitted to Dr. Capoferri on February 24, 1964, had notified and informed him of the deficiency assessments and penalties aggregating $5,386.31 on his individual income tax returns for 1959, 1960 and 1961, so it would seem that he should have

1. The exact date of the agent's initial call at Dr. Capoferri's office is not fixed in the record, but it obviously was prior to January 17, 1964, the date of the agent's 19-page report concerning Dr. Capoferri's 1959, 1960 and 1961 individual income tax returns, which was transmitted to Dr. Capoferri by the St. Louis office of the IRS on February 24, 1964. The agent's report and the letter of transmittal were received in evidence as defendant's exhibit B.

2. Dr. Day was "fairly certain" this meeting was on April *20*, 1964, as shown on "an appointment book in [his] office that is very accurately kept." Dr. Capoferri's recollection of the meeting date was April *22*, 1964.

had some idea as to the approximate amount assessed on his individual returns which was included in the aggregate figure of $19,874.56 assessed against the corporation and the dentists. But, when interrogated about the IRS report Dr. Capoferri "assumed" that he had received it "but to say I went over it or what its meaning was, no . . . . I referred it to Mr. Rashbaum or Mr. Shine [3] because they were handling the settlement of it."

However that may have been, the dentists did agree that Rashbaum then told them Dr. Capoferri owed $13,725.36 (69.06% of the aggregate figure of $19,874.56) and Dr. Day owed $6,149.20 (30.94% of the aggregate figure). Thereafter on April 22, 1964, Dr. Capoferri *personally* borrowed funds from a Lebanon bank, deposited them in the same bank in the *corporate* checking account controlled by him, and issued a remittance to the IRS in the sum of $13,-725.36 on a printed and numbered *corporate* check form, signed by him as President. Likewise, Dr. Day borrowed funds with which he paid the $6,149.20 allocated to him by Rashbaum.

The basis and method of Rashbaum's allocation of the aggregate tax assessment are *reflected in defendant's exhibit C,* a schedule prepared by him and captioned "Analysis of Benefits Derived from Utilization of Corporation—1959–1961 Incl.," which showed (a) the income tax actually paid by each dentist for each of those three years, (b) the income tax which would have been payable by each dentist for each of those years but for "utilization of the corporation," and (c) the resulting tax saving to each dentist for each year, and then in simple arithmetical calculations recorded on the schedule arrived at the result that the tax saving to Dr. Capoferri, whose income each year apparently had exceeded that of Dr. Day, was 69.06% of the total while the

tax saving to Dr. Day was 30.94% of the total. We also observe the notation on this schedule that the aggregate assessment of $19,874.56 by the IRS included assessments against each of the individual dentists for *three* years and against the corporation for *four* years. Another exhibit, plaintiff's exhibit 1 (of which more anon), informs us that the additional assessments against Dr. Capoferri were for 1959, 1960 and 1961, those against Dr. Day were for 1960, 1961 and 1962, and those against the corporation were for 1959, 1960, 1961 and 1962.

It is not clear just when the dentists first saw Rashbaum's schedule (deft's. ex. C). As was true with respect to numerous factual aspects of the case, the evidence on this subject was, to put it charitably, confused and confusing. E. g., with respect to the date when *Dr. Capoferri* first saw Rashbaum's schedule he said: "The first time I saw this, this was at a meeting at Dr. Day's office when our question came up about how this was figured. We were both shocked on the total amount of the tax. Q. You were shocked on what date? A. On the 22nd of April [1964] when we later had a meeting in Dr. Day's office and this is when we first came up with any kind of reconciliation as to what Mr. Rashbaum was trying to make as to what the IRS had found. Q. When was that meeting? A. It was some time after this date that we were notified to get this money together." *Dr. Day* testified positively that "the purpose" of the April 1964 meeting in his office was "[t]o decide a fair and equitable distribution of taxes owed according to the IRS records," that Rashbaum's schedule "was in the office" at that time, and that Rashbaum then explained to the dentists how he had determined, as shown on that schedule, what he believed to be an equitable allocation of the aggregate assessment. Furthermore, Dr. Day asserted that, after Rashb-

---

**3.** When the IRS "entered the picture" in the spring of 1964 and the dentists called Miceli, he told them (so he testified) that "you need a tax lawyer . . . I couldn't help you at all"; and, when they "wanted to know a tax lawyer," Miceli recommended Mr. James D. Shine, Jr.

aum's explanation, his allocation was "accepted as final" by both of the dentists. Unfortunately, Rashbaum had "shuffled off this mortal coil" [Shakespeare, Hamlet, Act III, Sc. 1] before trial of the instant case, so neither the circuit court nor this court has had the benefit of his version of the facts bearing upon the foregoing matters.

Under date of July 8, 1964, the dentists joined in a letter to Rashbaum terminating his employment and directing that their "accounts and records" be transferred to the firm of Stosberg, Davis and Musgrave at Higginsville, Missouri, and subsequently on a date not fixed in the record Haddon C. Stosberg of that firm began to handle the dentists' accounting. Other than the termination letter to Rashbaum, the transcript reflects no significant event or activity until Dr. Capoferri received a letter (not in evidence) dated November 17, 1964, from the IRS, with which was enclosed a tabulation (plaintiff's exhibit 1, copied marginally,[4] and hereinafter referred to as the IRS tabulation) reflecting (a) the assessments against the corporation and each of the dentists, (b) the IRS application of the dentists' April 1964 payments aggregating $19,874.56, and (c) a balance of $507.04 still owing and unpaid.[5]

Following receipt of this IRS letter and tabulation, the dentists and their tax attorney Shine met with an IRS agent in the Kansas City IRS office. Although the IRS application of the dentists' April 1964 payments showed the balance of $507.04 as owing by Dr. Capoferri, the IRS agent said "he didn't care who paid it or how" but he "was very insistent [on] getting that money right then"; and, although (so Dr. Day said) "there was some question at the time as to how we [the dentists] should prorate it," their accountant was not present and, after "some discussion," the dentists decided that "the best way to expedite the matter was to split it right then and be done

---

4. 

| Account Number C & D Dental Associates, Inc. | Period | Tax | Interest | Total Applied | Balance Due |
|---|---|---|---|---|---|
| 10025 | Yr. 1960 | $755.68 | $17.29 | $772.97 | 0 |
| 10026 | " 1961 | 855.03 | 28.12 | 883.15 | 0 |
| 10027 | " 1962 | 864.44 | 37.27 | 901.71 | 0 |
| 10028 | 5- 1–59 12–31–59 | 744.44 | 13.83 | 758.27 | 0 |

Total applied to C & D Dental Associates    $3,316.10

| Robert E. Day | Period | Tax | Interest | Total Applied | Balance Due |
|---|---|---|---|---|---|
| D–2556 | Yr. 1960 | 3,127.92 | 18.62 | 3,146.54 | 0 |
| D–2557 | " 1961 | 4,112.32 | 25.74 | 4,138.06 | 0 |
| D–2558 | " 1962 | 3,495.03 | 30.56 | 3,525.59 | 0 |

Total applied to Robert E. Day Accounts    $10,810.19

| Enzo L. Capoferri | Period | Tax | Interest | Total Applied | Balance Due |
|---|---|---|---|---|---|
| D–2545 | Yr. 1959 | 2,425.09 | 13.76 | 2,438.85 | 0 |
| D–2546 | " 1960 | 1,335.17 | 7.95 | 1,343.12 | 0 |
| D–2547 | " 1961 | 1,966.30 | 0 | 1,966.30 | $507.04 |

Total applied to Enzo L. Capoferri    $5,748.27

[Additional figures and computations, some in ink and others in pencil, appearing on this exhibit at the time of trial but admittedly having been placed thereon by Dr. Capoferri, were not offered or received in evidence, and hence are not copied here.]

---

5. When his counsel inquired whether he knew "to whom this additional assessment applied," Dr. Capoferri said "I never determined, I assumed that was just additional interest upon all the accounts  . . . .."

with the matter." Upon trial, Dr. Capoferri unqualifiedly approved the "question" put by Dr. Day's counsel that "it was agreed there [in the IRS office] at that time that it [the unpaid balance] would be split 50–50 in order to close up the tax accounts" for both of the dentists and the corporation. The date of this conference in the IRS office is fixed as December 14, 1964, that being the date of Dr. Capoferri's check for $272.20 [6] then issued for his one-half of the final payment.

Although Dr. Capoferri testified that he had never accepted as correct Rashbaum's allocation of the aggregate figure of $19,-874.56 at the April 1964 meeting, the transcript before us records no complaint or action until December 14, 1964. As *Dr. Capoferri* related it, after the dentists had made their final payments to the IRS "that same morning we went up to see Mr. Miceli, and I showed him this accounting that we had, this green sheet that I am speaking of,[7] and upon his advice, he said again as he had always said, he was not an accounting expert but apparently from that it looked like I had overpaid and he suggested we get another accountant's opinion and go from there." Thus it was, so Dr. Capoferri continued, "after talking to Mr. Miceli and receiving his advice that is when we agreed at his convenience, that the records of the corporation and the stock books and everything were at Dr. Day's office, to get someone relatively close to, where, if they needed any information, he would be handy to it . . . *so that is how we come about to choosing Stosberg.*" Coupled with this testimony concerning "how we come about to choosing Stosberg" on *December 14, 1964,* was Dr. Capoferri's declaration that he and Dr. Day were then "prompted . . . to discuss Mr. Stosberg and subsequently go to see him" because "we were still at a loss

whether we had each paid properly or not and we wanted to know, and we wanted to be right by one another."

However, when confronted on cross-examination with the dentists' joint letter of *July 8, 1964,* to Rashbaum terminating his employment and directing the transfer of their "accounts and records" to Stosberg's firm at Higginsville, Dr. Capoferri conceded "I am wrong on my timing . . . . That is the actual time we did agree on doing that." And, to the next question simply seeking confirmation of the prior admission that in July 1964, the dentists had definitely decided to use Stosberg to do their accounting, Dr. Capoferri couched such reaffirmation in this verbiage "[a]nd to refigure all of this, yes," and immediately undertook to explore "[n]ow here is what it might have been," which however was foreclosed by sustention of a timely objection.

*Dr. Day* well remembered the conference in the IRS office on December 14, 1964, and the final payment then made; but he did not recall a subsequent meeting with Miceli on that date and, when pressed by adversary counsel, declared "I don't believe there was any meeting of that nature."

*Attorney Miceli* was called as a witness for Dr. Capoferri. After the witness had testified concerning his advice to the dentists in 1959 regarding incorporation and his services in incorporating C & D Dental Associates, Inc., Dr. Capoferri's counsel posed this question ". . . I direct your attention to December 1964, did you ever confer with them again regarding the corporation," to which the witness responded, "I don't remember the exact date, but they did come in in either '64 or '65 with the work sheet of the IRS about their taxes and they asked me to explain all of this thing. I said

6. The record reflects no inquiry, explanation or assumption concerning the difference between $272.20 and $253.52 (½ of the $507.04 balance shown on the IRS tabulation).

7. Nothing in the record or any of the exhibits filed here enables us to identify "this accounting" or "this green sheet."

'Look, I don't know enough about this. You will have to get another CPA or someone to check this thing over for you and tell you where you stand on this.' I could not do it." On this answer patently denoting uncertainty as to the date of the meeting as well as the witness' incapability to render the service requested, Dr. Capoferri's counsel thereafter assumed that the dentists conferred with Miceli in December 1964. Suggesting "this might refresh your memory, perhaps," counsel inquired "do you recall whether these gentlemen had with them that date in December '64 what we referred to as plaintiff's exhibit No. 1 [copied marginally in note 4]," and the witness replied, "they may have had it but it has been so long ago. I don't recall."[8] Then asked "what, if anything was said specifically by Dr. Day at that conference . . . in 1964," Miceli offered the hesitant response, "well, I think he suggested they get this fellow from Lexington, I forget his name, to do the revamping of this finding and to tell them where they each stood." When counsel suggested "Stosberg," the witness immediately agreed that was the name and then added "I thought it was by mutual consent of both of them, that was my understanding. It has been so long ago—."

As we have seen, Dr. Capoferri's final payment to the IRS and his testimony fixed the date of this conference in Miceli's office as December 14, 1964. Only three days later, to wit, on December 17, 1964, Miceli wrote Dr. Capoferri at Lebanon, that letter being in evidence as defendant's exhibit A and copied marginally,[9] sans Miceli's printed letterhead, typewritten date, salutation to "Dear Cap," and complimentary close. "[T]he audit returns from Mr. Stosberg," to which Miceli referred in the first sentence of that letter, were not mentioned elsewhere in the record or offered in evidence.

Dr. Day asseverated that Stosberg was employed "to pick up" where Rashbaum had "left off" and "to carry on as best he could" in preparing 1964 tax returns for the corporation and dentists, and that he was not employed to "reaudit and study" the tax returns for prior years although he probably would have gone back to the IRS audits to make the "pickup." Dr. Capoferri conceded that "the first thing" required of Stosberg was "to get our 1964 tax returns in in time" but that, as his work schedule permitted, he was "to re-go over this accounting and to see whether the accounting on these taxes that we paid was correct."

Whatever Stosberg may have been requested to do, his only work product in evidence (as defendant's exhibit E) is a copy of a four-page letter addressed to Dr. Capoferri under date of May 25, 1965. Although stating in the first sentence that "[t]he following computation will show you the tax results of you and Dr. Day if the

8. This case was tried some six years later in December 1970 and then taken under advisement by the court.

9. "*I received the audit returns from Mr. Stosberg. I have looked them over and the information you desire can only be accurately prepared by an accountant, due to the many transpositions of items.*

"The Corporation's actual tax, plus the penalties and interest, total $3,316.13. The amount already paid was $9,046.06, an average of $5,729.93, which was applied to your individual accounts. *How much of this is yours and how much is Day's can only be ascertained by audit.* I presume you paid one-half the original corporation tax, and figuring it on this basis, each owning one-half, you would each have a credit from the corporation of $2,864.96.

"In the correction of your individual return you were assessed an additional $5,748.27 and Day $10,810.19. In computing the additional tax, I believe you were given credit for the excess in the corporation payment. If so, your part would be one-half of the corporation tax, $1,658.07, plus $5,748.27, or $7,406.34 and Day's $12,-468.25. And if you paid $13,725.36 of the total taxes owed, you should be due *$6,319.02.*

"I have tried to reach Mr. Rashbaum to obtain his work sheets but to date have not heard from him. *I suggest that your accountant take these reports which I enclose herein and audit same for you.*" (Emphasis ours)

corporation had not been in existence," Stosberg immediately pointed out that "I can only give you this computation for 1960 and 1961 as Dr. Day's 1959 return was settled before this examination and your [Dr. Capoferri's] 1962 return was settled after this examination," and then pointed out that the IRS assessments paid by the dentists included Dr. Capoferri's individual returns for 1959, 1960 and 1961, Dr. Day's individual returns for 1960, 1961 and 1962, and the corporation's tax returns for 1959, 1960, 1961 and 1962. These preliminary observations and caveats were followed by four pages of computations, the last entry or line being "Payment [by Dr. Capoferri] in excess of assessment—$5,738.57." The author then concluded his letter thusly: "I don't know whether these figures make any sense to you or not. I would be happy to meet with you and Dr. Day to discuss them."

In the interim between the IRS settlement on December 14, 1964, and Stosberg's letter of May 25, 1965, there had been two noteworthy developments, to wit, (a) an open rupture of the dentists' personal and professional relationship during March 1965, and (b) the dissolution of the corporation during April 1965 which was recommended by Stosberg and, pursuant to the dentists' request, handled by Miceli.

*Of the rupture.* The rupture of the dentists' relationship was evidenced and exacerbated by a three-page, single-spaced typewritten letter from Dr. Day to Dr. Capoferri dated March 14, 1965, defendant's exhibit F received in evidence as "showing credibility and the feeling of the parties only." The opening paragraph of that letter notified Dr. Capoferri that Dr. Day was moving his office location to another dentist's suite in Lebanon, suggested that this probably did not come "as a complete shock to you," but added that the writer nevertheless would "attempt on the following pages to explain" the principal reasons for his move. He assigned as "[t]he precipitating cause"

for that move "the grossly inconsiderate manner with which you shoved your cattle on the farm this fall when I was not prepared to accept them, feed them, water them, or watch after them during the winter," notwithstanding that "[y]ou were informed of these facts many times before you moved them here," and declared this "fiasco" had resulted in "additional expense that I could not afford, not only in money but more valuable time . . . ." In like tenor and tone, Dr. Day complained concerning Dr. Capoferri's alleged indiscriminate and improper booking of his patients for Dr. Day's attention on his Saturdays in Lebanon, which resulted in many of those patients being treated by Dr. Day "practically free."

In the remainder of the letter, Dr. Day reviewed "a couple of our ventures [that] did not pan out profitably for us, namely the Aerial Ag. Program and the C & D Corp.," both of which "were highly speculative and therefore very subject to loss." With respect to Aerial Ag., Dr. Day wrote that, since he "felt" his encouragement had "caused you to join the venture," he had attempted, in the manner and amounts there detailed, to reimburse Dr. Capoferri for the latter's investment of about $4,000. As for C & D, Dr. Day emphatically declared that he felt no such obligation to Dr. Capoferri, since both of the dentists "met Rashbaum and Miceli at the same time and in the same manner" and "[i]t was understood by all of us from the very outset that the venture may not work out as planned." Expressing the opinion that "[t]he only thing we have to squawk about is Rashbaum's failure to submit tax reports and his failure to cooperate with us in the ordeal" with the IRS, Dr. Day asserted "statements and comments that I have heard lead me to think that you would hold me responsible for involving you in this mess," which (so Dr. Day asserted) simply was "not true." Closing on a bitter note, Dr. Day recorded the opinion that "our friendship, which out-

wardly was on the call a 'Spade a Spade' basis has dissolved into 'Make a Buck' basis at my expense" and thus "it is a good time to make a clean break and each go our own separate ways."

*Of the corporate dissolution.* As we have heretofore recorded, at the time of incorporation Dr. Day executed and delivered to the corporation, in payment for a portion of the capital stock issued to him, his note for the difference in the aggregate valuations of the properties or equities therein conveyed to the corporation by the respective dentists. Dr. Capoferri thought that the principal sum of that note was "$39,000 or $39,500, somewhere around there." However, in Dr. Day's letter of March 21, 1965 (deft's. ex. G) to Dr. Capoferri, he referred to his "original $35,000 note." Whatever the stated principal sum may have been, no interest was ever paid on it; and when the corporation was dissolved, the note was cancelled and returned to Dr. Day. Also in the course of dissolution the corporation reconveyed to each dentist, by deeds which Miceli prepared, the properties theretofore conveyed by that dentist to the corporation when it was formed. As at the time of incorporation, there was no evidence even indicating the value of any property or equity therein when reconveyed by the corporation to one of the dentists. In this connection, we recollect that 2 shares of corporate stock were issued to Mulhern as an incorporating shareholder, concerning which Dr. Capoferri testified that he was not cognizant of "any contributions moneywise, propertywise, or otherwise" by Mulhern to the corporation and that he did not know "what actually happened to them [Mulhern's 2 shares] without going back to the records that I don't have."

Moving forward from May 25, 1965, the date of Stosberg's four-page letter to Dr. Capoferri (deft's. ex. E), copy of which was sent to Dr. Day, we take note of Dr. Capoferri's testimony that Stosberg had said "he was going to try to get he and Dr. Day and I together to discuss this thing" but later "told me he could never get a time agreeable with Dr. Day." Continuing, Dr. Capoferri stated he subsequently called Dr. Day "to get a time set up and *that is when I made my demand*" and elicited the reply that "he [Dr. Day] wasn't about to, he didn't feel that he owed it." (Emphasis ours) Dr. Day's testimony on this subject was that Stosberg never attempted to arrange a meeting with the two dentists and that, although Dr. Capoferri discussed Stosberg's letter of May 25, 1965, with him (Dr. Day), "we were at personal odds" then and "I told him . . . that I would not accept this letter at all." Furthermore, Dr. Day said that, prior to his hereinbefore reviewed letter of March 14, 1965 (deft's. ex. F), Dr. Capoferri had made no monetary claim against him and had never stated "that he [Dr. Capoferri] thought [Dr. Day] owed him any money."

Again advancing chronologically, we find that Dr. Capoferri instituted the case at bar on *October 2, 1965*, by the filing of his petition in which he alleged his payment of excess taxes and interest on April 22, 1964, pursuant to Rashbaum's unequal and inequitable allocation of the IRS assessments aggregating $19,874.56 against the corporation and the dentists, asserted that, when he discovered this "unequal pro-ration of taxes," he and Dr. Day agreed to submit the facts and figures to Stosberg, another independent auditor, and to abide by his findings and conclusions, and charged that, "upon completion of said independent audit it was determined by said auditor . . . that defendant [Day] owed to plaintiff [Capoferri] the sum of $6,319.04, together with interest thereon," but that, "in spite of said agreement," defendant refused to accept and abide by Stosberg's findings and to pay $6,319.04 for which sum, with interest thereon, plaintiff sought judgment. In due time, an answer was filed on behalf of Dr. Day embodying such admissions and denials as he and his counsel deemed appropriate and also affirmative defenses of accord and satisfaction, estoppel by reason of settle-

ment with the IRS, and estoppel by reason of liquidation of the corporation. Additionally defendant counterclaimed, "in the event that the court holds that the plaintiff's claim is not barred by reason of the affirmative defenses alleged in the defendant's answer," seeking an accounting with respect to all business transactions, including those of the corporation, in which plaintiff and defendant had been involved between 1957 and 1965.

The suit remained pending on these pleadings until *January 15, 1968,* when plaintiff Capoferri filed his first amended petition in which he (a) emphasized the "distribution of the corporate net assets . . . upon the basis of [Capoferri's and Day's] equal and respective ownership of 560 shares of stock therein," complained about Rashbaum's unequal proration of the IRS aggregate assessments against the dentists and the corporation, and declared that as a result thereof he (Capoferri) had paid taxes and interest of $6,319.04 in excess of his legal obligation to pay "by virtue of equal ownership of [corporate] shares . . . and . . . equal distribution of net corporate funds and net assets," and (b) again pleaded the alleged mutual agreement to submit the "facts and figures" to Stosberg, who made an "independent audit" reflecting an overpayment of $6,319.04 by plaintiff Capoferri, for which he sought judgment with interest thereon. In due time defendant Day filed his answer embodying certain admissions and denials and pleading the same affirmative defenses as in his original answer, and at the same time reasserted the counterclaim previously filed.

On *December 7, 1970,* the case was tried in the Circuit Court of Laclede County and taken under advisement by the then circuit judge. Neither party having requested before final submission a statement of the grounds for decision, findings on specified issues of fact, or the method of determining damages awarded [Rule 73.01, par. 1(b), V.A.M.R.], on March 9, 1972, the court found "all the issues" for plaintiff Capoferri and against defendant Day, entered judgment for plaintiff in the principal sum of $6,319.04 with interest thereon from April 22, 1964, and dismissed defendant's counterclaim.

Whatever may have been plaintiff's precise legal theory of recovery, concerning which we find no specific declaration in his brief and we need not undertake to determine here, it is unmistakably clear that essential elements of plaintiff's case as pleaded and presented were not only (a) an alleged oral agreement between the dentists to submit the "facts and figures to an independent auditor" identified as Stosberg but also (b) "an independent audit" by Stosberg which allegedly reflected "an overpayment by plaintiff [Capoferri] of taxes and interest" in the sum of $6,319.04. The record is replete with references to Stosberg, only a few of which had been noted in our nimious factual review. But, notwithstanding plaintiff's repeatedly stated reliance upon Stosberg and an independent audit by him (which, so it would seem, to be meaningful in resolving the controversy at bar, necessarily would have covered the years prior to 1964 for which additional IRS assessments had been imposed), no such audit was shown to have been made, the only work product of Stosberg in evidence was the hereinbefore discussed four-page letter to Dr. Capoferri dated May 25, 1965 (deft's. ex. E), Stosberg's testimony was not adduced in person or by deposition, and the record reflects neither effort to present his testimony nor explanation for failure to do so.

In this court-tried case, our review is upon both the law and the evidence as in suits of an equitable nature, according due regard to the opportunity of the trial court to have judged the credibility of the witnesses [Rule 73.01, pars. 3(a) and (b)], and we are directed to dispose finally of the case, "[u]nless justice otherwise requires."

558 ▮

Rule 84.14, V.A.M.R. Household Finance Co. v. Watson, 522 S.W.2d 111 (Mo.App. 1975). Of course, our duty to make final disposition of the case on appeal presupposes a record and evidence upon which we can perform this function with some degree of confidence in the reasonableness, fairness and accuracy of our conclusion; and, when such record and evidence are not presented, reversal and remand necessarily follow. Phelps v. Watson-Stillman Co., 365 Mo. 1124, 1132, 293 S.W.2d 429, 435(5) (1956); Swan v. Shelton, 469 S.W.2d 943, 951(6) (Mo.App.1971); In re I.M.J., 428 S.W.2d 18, 22(5) (Mo.App.1968). See also Saville v. Bradshaw, 359 S.W.2d 676, 678–679(2) (Mo. 1962); Farrar v. Moore, 416 S.W.2d 711, 714–715(8) (Mo.App.1967); State ex rel. State Highway Comm'n v. Hill, 373 S.W.2d 666, 668(1, 2), 671 (Mo.App.1963).

▮▮ In the course of inordinately protracted consideration of this appeal, we have been impelled reluctantly but inescapably to the conclusion that the judgment nisi must be set aside but that we cannot make final disposition of the case on this appeal. This for the reason that on the record here presented we are unable to determine with any degree of confidence in the reasonableness, fairness and accuracy of our conclusion either (a) whether there is any sound legal basis for a monetary recovery by either dentist from the other or (b) if so, on what theory and in what amount. Each of the parties is represented by experienced and capable counsel, and it is neither our function nor our prerogative to suggest possible legal theories.

The judgment for plaintiff is set aside and the cause is remanded to the circuit court for further proceedings and retrial.

BILLINGS, C. J., and HOGAN and TITUS, JJ., concur.

FLANIGAN, J., not participating.